Perry Steven MILLER, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 64S00–9408–PD–00742.

Supreme Court of Indiana.

Dec. 8, 1998.

Susan K. Carpenter, Public Defender, Ann M. Pfarr, Joanna Green, Deputy Public Defenders, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

Perry Steven Miller appeals the denial of post-conviction relief with respect to his convictions for Murder,[1] Criminal Confinement,[2]

1. Ind.Code § 35–42–1–1 (Supp.1989).

2. Ind.Code § 35–42–3–3 (Supp.1989).

Rape,[3] Criminal Deviate Conduct,[4] Robbery,[5] and Conspiracy to Commit Murder,[6] and his sentences of death[7] and 220 years. We previously affirmed these convictions and sentences on direct appeal. *Miller v. State,* 623 N.E.2d 403 (Ind.1993). We now affirm the denial of Miller's petition for post-conviction relief.

Our earlier opinion contains a more complete description of the crimes of which Miller was convicted. *Id.* Briefly, Miller, William Harmon, and Rodney Wood robbed a convenience store in the early morning hours of November 14, 1990, and then abducted, raped, tortured, and murdered the teenaged female clerk who worked there. We will recite additional facts as necessary.

## *Discussion*

■ A person convicted of, or sentenced for, a crime by a court of this state has a constitutional right to appeal that conviction or sentence directly to either this Court or the Court of Appeals. Ind. Const. art. VII, §§ 5 & 6. As stated above, Miller exercised his right to a direct appeal and this Court affirmed his convictions and sentences. *Miller,* 623 N.E.2d 403. After such an appeal, Indiana law permits the person to seek "post-conviction relief" through a special, quasi-civil action in certain circumstances and under certain conditions. Ind.Post—Conviction Rule 1(1). *See Lowery v. State,* 640 N.E.2d 1031, 1036 (Ind.1994) (post-conviction remedy not substitute for appeal), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); *Weatherford v. State,* 619 N.E.2d 915, 916 (Ind.1993) (post-conviction procedures do not provide "super appeal").

■ To the extent that a person seeking post-conviction relief (usually referred to as the "petitioner") has been denied relief by the post-conviction court, the petitioner appeals from a negative judgment. This is because at the trial on the petition for post-conviction relief, the petitioner has the bur-

den of establishing any grounds for relief by a preponderance of the evidence. P—C.R. 1(5). Such is Miller's situation here. When a petitioner appeals from a negative judgment, he or she must convince the appeals court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the trial court. *Roche v. State,* 690 N.E.2d 1115, 1120 (Ind. 1997); *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995) (citations omitted). This Court will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Roche,* 690 N.E.2d at 1120; *Spranger,* 650 N.E.2d at 1120.

## I

■ Miller primarily contends that he was denied his constitutional right to effective assistance of trial and appellate counsel.[8] U.S. Const. amend. VI; Ind. Const. art. I, § 13. The United States Supreme Court and this Court have firmly recognized this constitutional right, which requires the effective assistance of both trial and appellate counsel. *United States v. Cronic,* 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *King v. State,* 467 N.E.2d 726, 728–29 (Ind.1984). We analyze claims of both ineffective assistance of trial counsel and ineffective assistance of appellate counsel according to the two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Lowery,* 640 N.E.2d at 1048 (standard of review for claim of ineffective assistance of appellate counsel identical to standard for trial counsel). First, we require the petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional

---

**3.** Ind.Code § 35–42–4–1 (Supp.1989).

**4.** Ind.Code § 35–42–4–2 (1988).

**5.** Ind.Code § 35–42–5–1 (1988).

**6.** Ind.Code § 35–41–5–2 (1988).

**7.** Ind.Code § 35–50–2–9 (Supp.1990).

**8.** Miller also contends that this Court has never meaningfully reviewed his death sentence. We discuss this claim separately in part III, *infra.*

norms. *Roche,* 690 N.E.2d at 1120 (citing *Lowery,* 640 N.E.2d at 1048). Second, we require the petitioner to show adverse prejudice as a result of the deficient performance. *Id.* We will find prejudice when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unjust or unreliable. *Id.* *See also Smith v. State,* 689 N.E.2d 1238, 1244–45 (Ind.1997).

 In the sections of this opinion that follow, we analyze a number of specific situations in which Miller alleges that counsel rendered deficient performance with resulting prejudice of sufficient character to entitle him to post-conviction relief. Although we elect to examine each of these specific situations, we emphasize that to establish both deficient performance and resulting prejudice, a petitioner must show more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience; *the defense as a whole must be inadequate.* *Davis v. State,* 675 N.E.2d 1097, 1100 (Ind.1996) (quoting *Terry v. State,* 465 N.E.2d 1085, 1089 (Ind. 1984)). The United States Supreme Court stated this concept as follows: "[S]ince there are countless ways to provide effective assistance in any given case, unless consideration is given to counsel's overall performance, before and at trial, it will be all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, internal quotation marks omitted). *See also Potter v. State,* 684 N.E.2d 1127, 1135 (Ind.1997) (while "there were isolated moments when Potter's trial counsel made what Potter might now term 'mistakes'[, this Court could not say] in looking at the record as a whole ... that these isolated mistakes rendered the representation ineffective"). *Cf. Smith v. State,* 547 N.E.2d 817, 822 (Ind.1989) ("counsel's compilation of errors in the guilt phase ... rendered appellant's defense so anemic that our confidence in the guilty verdict itself is undermined so as to require reversal of appellant's convictions as well"). Here we find no deficient performance in any of the situations Miller identifies of sufficient character to proceed to the further inquiries of whether prejudice resulted therefrom or whether the defense as a whole was inadequate.

 Miller's defense team consisted of trial counsel, an attorney who worked as a research assistant, and trial counsel's son, who served as an investigator of sorts. A different attorney represented Miller in his direct appeal to this Court. The post-conviction court found that Miller had waived the issue of trial counsel ineffectiveness by not raising it in his direct appeal, but nevertheless addressed the merits of Miller's claims. This Court recently held that a claim of ineffective assistance of counsel, "if not raised on direct appeal, may be presented in postconviction proceedings." *Woods v. State,* 701 N.E.2d 1208, 1220 (Ind. 1998). Based on *Woods,* we find that Miller has not waived the issue of ineffective assistance of trial counsel.

Miller contends he was denied the effective assistance of both trial and appellate counsel. We discuss Miller's claims of ineffective assistance of appellate counsel in part II, *infra.* With respect to trial counsel, Miller advances the following claims of ineffective assistance: (a) trial counsel failed to request a continuance to prepare for, and failed to challenge the State's use of hair, serological and DNA evidence; (b) trial counsel failed to investigate adequately certain tire and shoe print evidence; (c) trial counsel inflamed the jury by refusing to apologize for invading the jurors' privacy; (d) trial counsel failed to investigate and rebut the damaging testimony of a prosecution witness; (e) trial counsel presented psychiatric testimony about Miller's lack of sadistic and aggressive tendencies and opened the door to prejudicial rebuttal testimony from two of Miller's prior rape victims; and (f) trial counsel failed to present during the penalty phase relevant and available mitigating evidence regarding (1) Miller's positive institutional adjustment while in prison for kidnaping and rape, (2) his social history, and (3) the jury's right to consider any residual doubt it might harbor about Miller's involvement in the crimes of which he had been convicted.

### A

Miller contends that he was denied his constitutional right to the effective assistance

of counsel because of the way in which trial counsel attempted to counter certain hair, serological and DNA evidence offered by the State against Miller. He argues that counsel should have moved for a continuance after receiving the State's witness list and test results with respect to this evidence. He further argues that after receiving this evidence, trial counsel should have retained independent experts to analyze it.

### A–1

Trial counsel had moved for a speedy trial and the trial court had granted the motion. Trial counsel had also filed pretrial discovery requests seeking from the State the name of its expert witnesses and the results of their lab tests on the physical evidence. The State did not immediately comply with the discovery request, so trial counsel moved to exclude the results of the State's tests and the physical evidence. The State then moved for a continuance, which the trial court granted. At the outset of the trial, counsel withdrew the motion to exclude, stating that he had been aware of "some hair sample comparisons ... for probably a week or two weeks now[,]" that he had received "yesterday a copy of the DNA from the FBI[,]" and that "this morning [he had received] the complete forensic evidence report from the Indiana State Police lab." In brief, this information included: (i) results of an examination (conducted by Lisa Black, an Indiana State Police (ISP) forensic hair examiner) of head and public hair standards taken from Miller, Harmon, Wood, and the victim, as well as hairs of unknown origin found on the victim's body and at the crime scene; (ii) results of an examination (conducted by Dana Peterson, an ISP forensic serologist) of samples taken from the victim's body, including bodily fluids such as blood and semen; and (iii) results of DNA testing (conducted by Audrey Lynch, a special agent for the Federal Bureau of Investigation (FBI)) on two vaginal swabs taken from the victim.

■ Miller contends that counsel should have moved for a continuance upon receiving the State's witness list and the test results. The post-conviction court made findings of fact that trial counsel's decision to accept the State's late discovery and to proceed to trial was a tactical one and that Miller did not demonstrate that he would have benefitted from a continuance.

■ Our review of the record indicates that there was evidence to support these findings. At the post-conviction hearing, trial counsel testified that he intended to move the trial along rapidly and force the State to deal with issues relating to the physical evidence before it was ready to do so. The post-conviction court concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to counsel's failure to request a continuance. Our review does not lead us to an opposite conclusion. The decision not to seek a continuance is the kind of a strategic choice that is within the province of counsel, as would have been a decision by counsel to seek a continuance under these circumstances. *Cf. Johnson v. State,* 675 N.E.2d 678, 685 (Ind.1996) (no ineffective assistance where trial counsel sought two continuances despite defendant's speedy trial request, and defendant did not demonstrate different outcome).

We affirm the post-conviction court's conclusion that Miller has failed to demonstrate that trial counsel's decision not to seek a continuance constituted ineffective assistance of counsel.

### A–2

Miller contends that once the State provided its witness list and test results, trial counsel should have retained experts to analyze independently the hair evidence and the serological and DNA evidence. The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to counsel's failure to retain experts for these purposes.

*Hair Evidence.*[9] The State contended at trial that one of three pubic hairs recovered

---

**9.** *See generally McGrew v. State,* 682 N.E.2d 1289 (1997) (discussing admissibility of expert testimony on hair comparison analysis).

from the victim proved Miller was at the crime scene. Black, the State's forensic hair examiner, had examined head and pubic hair standards taken from Miller, Harmon, Wood, and the victim, as well as hairs of unknown origin found on the victim's body and at the crime scene. On direct examination, Black testified that the unknown pubic hair collected from the victim's body shared sufficiently similar microscopic characteristics with the standard taken from Miller that they were of common origin.

On the day Black testified, trial counsel directed his research assistant to retain a hair expert for Miller's defense. The assistant contacted two laboratories; one had a conflict, and the other could not perform the requested analysis in time for trial. At this point, the assistant decided to pursue a different route and began researching the validity of hair analysis. *Id.* Ultimately, the assistant provided trial counsel with two scientific articles concerning the validity of hair analysis. Trial counsel reviewed these articles and used them to cross-examine Black.

On cross-examination, Black acknowledged that hair analysis is not able to identify the individual who is the source of the sample examined with as high a degree of probability as fingerprint or serological analyses. And while the pubic hair collected from the victim's body was sufficiently similar to Miller's that it could have come from him, Black further acknowledged that her testimony was not that the pubic hair did indeed come from him.[10]

At the post-conviction hearing, Miller presented a research microscopist, Dr. Bisbing, whose testimony tended to contradict Black's trial testimony. According to Dr. Bisbing, the three pubic hairs taken from the victim each shared similar characteristics with each other and with the victim's known hair standard, but not with Miller's known hair standard. Dr. Bisbing concluded that the hairs found on the victim differed from standards taken from Miller in "the color, the diameter,

the pigment distribution, the type of medulla, and the structure of the cortex." However, Dr. Bisbing also testified that Black followed generally acceptable procedures and methods in performing her forensic hair examinations, and that Black's "testimony was fully in agreement with the way I would do [hair comparisons]."[11]

■ Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. Trial counsel reviewed scientific articles addressing the validity of hair analysis and used them to cross-examine the State's witness, Black. This cross-examination yielded acknowledgments from Black suggesting the inferiority of hair analysis compared to fingerprint and serological analyses as an identification technique and that the pubic hair, while similar to Miller's, was not definitely his. And although Dr. Bisbing's testimony might have proved helpful to Miller's defense at trial, Dr. Bisbing also testified that Black conducted the hair examination in a generally accepted manner.

*Serology Evidence.* Peterson, a forensic serologist for the Indiana State Police, described at trial the procedures she followed in examining a number of different swabs and slides of samples taken from the victim's body. Peterson examined each slide or swab for bodily fluids. If Peterson detected the presence of a fluid, such as blood or semen, she then attempted to identify the contributor based on blood type. With regard to each piece of evidence about which she testified, Peterson reached one of four conclusions: (1) there was no dried blood or semen present; (2) she could not identify the contributor of the dried blood or semen; (3) the blood came from the victim; or (4) the dried blood or semen could have come from any of Miller, Harmon or Wood.

Trial counsel focused his cross-examination of Peterson on her examination of one vaginal swab on which she detected a particular

---

10. On cross-examination, Black agreed with trial counsel that a procedure different from the one she employed would produce more accurate results. However, Black changed her opinion on recross-examination, and maintained that the procedure she utilized produced more accurate results.

11. Dr. Bisbing disagreed semantically with Black's use of the phrase "sufficient characteristics to be of common origin," which he acknowledged was commonly used by other laboratories.

enzyme marker. On cross-examination, Peterson testified that Miller, Wood, and Harmon each carried this enzyme marker which was foreign to the victim. However, Peterson could not determine whether Miller, Wood, or Harmon contributed the blood or semen detected on the vaginal swab.

As part of his argument that trial counsel should have retained an independent serology expert, Miller contends that trial counsel pursued a "bizarre" line of questioning with Peterson. This questioning related to a swab taken from the victim's left inner thigh.

> Q [defense counsel]: Can you tell the jury or can you tell me if the dried blood or semen came from Perry Miller, did it come from Perry Miller, do you know?
>
> A [Peterson]: It could have. I don't know.
>
> * * *
>
> Q: Or 26 percent of the population; is that correct?
>
> * * *
>
> A: No, it could not have come from 26 percent of the population. We're just looking at that particular [foreign enzyme marker.] We have to also include all the other different enzyme markers that I found on that stain.
>
> Q: Okay. And I was hoping that's what I was asking you. Based on the totality of your examination, what percentage of the population would fall under the same categories with Perry Miller, William Harmon, and Rodney Wood?
>
> A: I would have to figure out that particular statistic for those two enzymes and include all the different types that would be possible, if you would like me to do it.
>
> * * *
>
> Q: Please. I'd like you to do it for me then, if you would.

Following this colloquy, Peterson calculated that "about three percent of the population [have] that particular enzyme type[.]"

At the post-conviction hearing, Miller presented testimony from a forensic serologist who opined that this latter percentage was scientifically irrelevant, and that trial counsel prejudiced Miller by eliciting that information from Peterson.[12] However, immediately after eliciting the "three percent" statistic from Peterson, trial counsel again cast doubt upon the results of the serological tests. He asked whether the dried blood taken from the victim's left inner thigh was Miller's. Peterson responded that she could not say that it was Miller's "alone," that is, that it could not have come from another.

> Q [defense counsel]: Based on your analyses and the tests that you've run, again let me ask you in regard to [the left inner thigh swab]: Can you say, as you sit here today, that the dried blood that you examined came from Perry Miller?
>
> A [Peterson]: The dried blood could not have come from Perry Miller alone if it was his present.

(R. at 2704.)

■ Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. Trial counsel elicited testimony from the State's expert on cross-examination that she could not determine whether the vaginal specimen she tested came from Miller and that the inner thigh specimen did not come from Miller.

*DNA Evidence.* Peterson submitted the samples of dried blood and semen taken from the victim to the FBI for DNA testing.[13] Lynch, a special agent for the FBI, conducted DNA testing on the vaginal swab discussed above and on another vaginal swab. Lynch testified that she obtained a DNA

---

12. As explained by the forensic serologist, Peterson's testimony (that only three percent of the population could have contributed the blood or semen found on the inner thigh swab) was scientifically irrelevant and misleading because when Peterson calculated that percentage, she included not only the enzyme marker foreign to the victim, but also characteristics present in the blood on the swab which could have come from the victim.

13. Miller presented a forensic serologist who testified at the post-conviction hearing that, because DNA testing is more precise and individualized than is serology, Peterson's testimony was irrelevant given the DNA findings.

profile matching that of Harmon. Miller now argues that he was denied his constitutional right to the effective assistance of counsel when trial counsel failed to get Lynch to testify that DNA testing excluded Miller as a potential contributor of blood and semen to samples taken from the victim.

At the outset of his cross-examination of Lynch, trial counsel asked, "The results of all of your examinations, DNA, you found nothing connecting Perry Miller with any of those exhibits; is that correct?" Lynch responded, "On the exhibits in which I obtained conclusive results, those all matched William Harmon." Lynch submitted an affidavit at the post-conviction hearing in which she testified that the DNA results she obtained excluded Miller as a possible contributor of the bodily fluids detected on the vaginal swabs.

■ As to the DNA evidence, the fact that trial counsel elicited testimony from the State's expert on cross-examination that the DNA she tested was Harmon's supports the post-conviction court's findings. As such, Miller's contention appears to be purely semantic: At trial, Lynch testified that the DNA results "matched William Harmon," whereas in her post-conviction affidavit, Lynch stated that the DNA results "excluded Miller."

*Conclusion as to Hair, Serology and DNA Expert Claim.* Our review of the post-conviction court's findings does not lead us to a conclusion opposite that of the post-conviction court. Counsel's cross-examination of the three State's experts yielded testimony from the State's hair expert that hair analysis was not able to identify the pubic hair as indeed having come from Miller, from the State's serology expert that the dried blood examined did not come from Miller "alone," and from the State's DNA expert that the DNA examined matched Harmon's DNA. Having elicited this testimony from the State's experts, it was not deficient performance for counsel not to have secured independent experts. *See Huffington v. Nuth,* 140 F.3d 572, 580–83 (4th Cir.1998) (alleged failure to challenge adequately state's physical evidence and expert testimony regarding bullet composition, hair comparison, and fingerprint identification not ineffective assistance where decision not to attack such evidence was strategic, given defense theory of absence from crime scene), *cert. denied,* —— U.S. ——, 119 S.Ct. 444, —— L.Ed.2d —— (1998); *People v. Bolin,* 18 Cal.4th 297, 75 Cal.Rptr.2d 412, 956 P.2d 374, 400 (1998) (decision whether to cross-examine "more rigorously" is matter of strategy, and no ineffectiveness where defendant fails to demonstrate different result from counsel's "lack of attack" in cross-examining state's witnesses and failure to hire expert); *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 449 (1997) ("speculative" failure to request funds to hire ballistics expert not ineffective where trial counsel extensively cross-examined state's expert and defendant does not demonstrate prejudice), *stay granted,* 550 Pa. 406, 706 A.2d 342 (1998), *cert. denied, Harris v. Pennsylvania.,* —— U.S. ——, ——, 119 S.Ct. 538, —— L.Ed.2d —— (1998). We affirm the post-conviction court's conclusion that Miller has failed to demonstrate any ineffective assistance of counsel with regard to trial counsel's handling of the State's hair, serological, and DNA evidence and his decision not to secure independent experts.

### B

■ Miller contends that he was denied his constitutional right to the effective assistance of counsel because trial counsel did not identify a State's witness who examined tire and shoe prints collected at the crime scene, thereby preventing trial counsel from presenting exculpatory evidence promised in his opening statement. The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to this claim of ineffective assistance of counsel. Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact.

Prior to trial, counsel had received from the State its list of submissions for forensic testing, which included a request for soil analysis. In his opening statement, trial counsel alluded to this request, suggesting that soil samples to be introduced by the State could not be connected with Miller's car or shoes. At the post-conviction hearing, Miller tendered an affidavit from the State's

shoe and tire print examiner, John Vanderkolk, to which Vanderkolk had appended examination results showing no matches from Miller's shoes or tires to either the shoe or tire impressions taken from the crime scene. Trial counsel had never contacted Vanderkolk and in fact was unaware of who had examined the shoe and tire print evidence.

However, at trial the State presented the following testimony from the assistant chief of the Valparaiso Police Department, who was in charge of investigating the death of the victim in this case:

> Q [prosecutor]: Now, in part of your processing the scene, did you try to take photographs of any footprints or any and all photographs?
>
> A: Yes, sir, we photographed every footprint we could see, the tire castings that we made in this driveway area.
>
> \* \* \*
>
> Q: To your knowledge, has any of the investigation, have you ever been able to match any of the footprints to any of the suspects or to anybody else?
>
> A: No, sir.
>
> Q: How about the tire tracks?
>
> A: No, sir.

(R. at 1930.)

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. The State presented substantially the same exculpatory testimony in its direct examination of one of its own witnesses as trial counsel suggested in his opening argument that he would be presenting.[14] Our review of the post-conviction court's findings does not lead us to a conclusion opposite that of the post-conviction court. Having testimony from the State's direct examination of its own police witness that the soil samples could not be connected with Miller's car or shoes, it was not deficient performance for trial counsel not to have identified or called Vanderkolk. See *Chupp v. State*, 509 N.E.2d 835, 838–39 (Ind.1987) (defense counsel's failure to present exculpatory statement by victim not inef-

fective assistance where victim made same statement in court under oath); *Williams v. State*, 508 N.E.2d 1264, 1268 (Ind.1987) ("counsel's failure to present exculpatory evidence may not constitute ineffective assistance where that evidence is introduced to the jury through other witnesses"). See also *Lawrence v. State*, 464 N.E.2d 1291, 1295–96 (Ind.1984) (failure to present exculpatory evidence not ineffective assistance where similar substantive testimony was introduced through other defense witnesses). We affirm the post-conviction court's conclusion that Miller has failed to demonstrate any ineffective assistance of counsel with regard to trial counsel's handling of shoe and tire print evidence.

### C

 Miller next contends that he was denied his constitutional right to the effective assistance of counsel as a result of certain comments trial counsel made to the jury. Specifically, Miller claims that trial counsel inflamed the pool of prospective jurors by refusing to apologize for having taken pictures of their homes. Br. of Appellant at 36. The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to this claim of ineffective assistance of counsel.

In preparation for voir dire, trial counsel had hired his son to photograph the homes of the prospective jurors. At the post-conviction hearing, trial counsel testified that he had learned this technique at a death penalty seminar. Miller's argument is that trial counsel refused to apologize to the prospective jurors after some of them expressed during voir dire their displeasure with the picture-taking incident, and that this alleged refusal prejudiced the jury against Miller.

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. Contrary to

---

14. Miller finds a distinction between Vanderkolk's affidavit testimony and the investigating officer's statement in that the latter "could be taken two ways—whether he knew if any testing was completed or whether he knew the results of

any testing." Reply Br. of Appellant at 4. Even if we were to agree, we do not find the fact that a witness's statement could be taken two ways sufficient to serve as the basis for post-conviction relief here.

Miller's contention, we read the portions of the record that Miller cites in support of this proposition to show that trial counsel was not "refusing to apologize" in a combative sense. Rather, trial counsel was explaining his reasons for having photographed the prospective jurors' homes, and effectively was apologizing for having done so:

> And I can't tell you necessarily that taking pictures of your homes is going to assist me a great deal in this case. I don't know that.... Anything that assists me on behalf of Perry Miller in doing my job, and it may very well be in putting a profile together of [what] we're looking for in fair and impartial jurors that having taken pictures of your home may be of some assistance to me and to Perry Miller.... But hopefully by my explanation to you of the seriousness that we're involved with and the seriousness what you're going to be asked to consider I would certainly hope that you could understand again that I did everything and will continue to do everything possible in defending Perry Miller.... And, unfortunately, *I can't apologize* to you for having done what I did. I can only try to explain to you the reason that I did it. That's my obligation to Perry Miller. It's my obligation to the system of justice. I have my obligation to this court to do the best job I possibly can. I'm hoping that's a sufficient explanation for you[.]

(R. at 745–47) (emphasis added).

> Years ago it was not unusual, and I did it myself, to send a private investigator out to talk to neighbors and the police and so forth and, yes, indeed, I agree with you, it is, to some intent and purposes, an infringement upon your privacy. I know that. I'm sorry if we caused you any inconvenience. *I can't apologize* to you, however.

(R. at 1467) (emphasis added). Although trial counsel used the phrase "I can't apologize," he was doing just that.

Our review of the post-conviction court's findings does not lead us to a conclusion opposite that of the post-conviction court. Miller has not established that counsel's performance in this regard was deficient. We affirm the post-conviction court's conclusion that Miller has failed to demonstrate that he was denied his constitutional right to the effective assistance of counsel in this regard.

### D

Miller contends that he was denied his constitutional right to the effective assistance of counsel when trial counsel failed to investigate and rebut the damaging testimony of a prosecution witness. The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to this claim of ineffective assistance of counsel.

State's witness Karyl Kelley, a hardware store clerk, testified that on November 12, 1990 (two days before the crimes at issue occurred), Miller purchased from her a box of .12 gauge Remington shotgun shells,[15] some nails and a nail puller, and a utility knife. Kelley testified that she remembered Miller because Miller paid for part of his purchase with check number 1204 from the account of "Perry Miller" in the amount of $14.49. Kelley maintained that this transaction stuck out in her mind because (1) the name "Miller" is on the hardware store's bad check list, and she had to verify the check against the list, and (2) she has an uncle named Perry. Kelley also offered her recollection that when she asked Miller if he was going deer hunting, he replied, "[S]ort of, [a] 115 pound one."

At the post-conviction hearing, Miller introduced into evidence a check number 1204 issued on November 12, 1990, and made payable to the hardware store at which Kelley worked. The check was drawn on the account of David and Sherree Miller, who are

---

**15.** A subsidiary component of this claim of ineffectiveness is that trial counsel failed to point out on cross-examination of Kelley that no .12 gauge Remington shotgun shells were recovered from the crime scene. However, a .12 gauge shotgun shell and casing of a different brand were recovered from inside the victim's car, which Wood

had driven to the crime scene. A .12 gauge shotgun shell of a brand other than Remington was found in Miller's car. Therefore, although Kelley was mistaken about the brand, her testimony that Miller purchased .12 gauge shotgun shells nevertheless is probative.

unrelated to Miller. Miller bases his claim of ineffectiveness on trial counsel's failure to have discovered this check and to have disproved all aspects of Kelley's testimony. However, trial counsel established on cross-examination that Kelley earlier had given a statement to the police in which she stated Miller came into the hardware store on November 10 rather than November 12.[16] Furthermore, in his direct examination of Betty Miller, Miller's wife, trial counsel established that Miller had a checking account in the name of Steven Miller (not "Perry Miller," as Kelley had testified) and that Miller had not written a check in the amount of $14.49 during the entire statement period including November 12, 1990.[17] Miller's checking statement, which trial counsel admitted into evidence, also demonstrated that all of Miller's checks were numbered much lower than 1204.

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. Although trial counsel could have done more to investigate and rebut Kelley's testimony, trial counsel cast substantial doubt on Kelley's testimony by introducing evidence that Miller's checking account was under a different name and that all of Miller's checks were numbered lower than 1204.

Our review of the post-conviction court's findings does not lead us to a conclusion opposite that of the post-conviction court. Miller has not established that counsel's performance in this regard was deficient. We affirm the post-conviction court's conclusion that Miller has failed to demonstrate that he was denied his constitutional right to the effective assistance of counsel in this regard.

16. Kelley maintained that the discrepancy between the earlier statement and her testimony at trial was a result of the police misquoting her. (R. at 2337–38.)

17. None of the checks Miller submitted were made payable to the hardware store. However, not all of the checks listed in the checking statement were admitted into evidence. (R. at 2894–2903.)

18. Miller also claims that trial counsel performed ineffectively when he extracted harmful testimony on cross-examination from Wood and April Bowman, a friend of Wood. (Miller, Harmon,

## E

Miller contends that he was denied his constitutional right to the effective assistance of counsel when trial counsel called to the stand Dr. Frank Brogno, a psychiatrist, and opened the door to damaging rebuttal testimony.[18] Miller also contends that he was denied his constitutional right to the effective assistance of counsel when trial counsel failed to raise a proper objection to the trial court's instruction to the jury with respect to this rebuttal testimony. The post-conviction court made certain findings of fact, including that the jury had been properly instructed, from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to this claim of ineffective assistance of counsel. (R. at 791.)

Dr. Brogno interviewed and performed a battery of psychiatric tests on Miller, and based his trial testimony on the results he obtained. Brogno offered his expert opinion as follows:

1. Miller had no severe psychological or psychiatric syndromes, and no severe or major personality disorders.

2. Miller did not exhibit cracks in his thought processes, although he did exhibit some mild depression.

3. Miller demonstrated some sensitivity to art.

4. Miller's personality profile did not display aggressive or sadistic tendencies. Sadistic or aggressive tendencies are lifelong patterns unlikely to change or develop over time.

In an attempt to rebut Dr. Brogno's testimony, the State called as witnesses two wom-

and Wood planned to commit other crimes and had raped a prostitute at gunpoint; Miller approached Bowman and another woman about working as prostitutes). The post-conviction court made certain findings of fact from which it concluded that trial counsel's cross-examination of Wood and Bowman was "strategic and tactical" and did not constitute ineffective assistance. We agree. Miller does not develop this claim beyond reciting this "harmful information." Furthermore, trial counsel got Wood to admit that he had never mentioned these other plans before, and the prosecutor already had elicited the same testimony from Bowman on direct examination.

en, each of whom testified that Miller had raped her. The State first called a rebuttal witness who testified that Miller had raped her and beaten her almost to death. Although charges were filed against Miller in this incident, he was never brought to trial. The State next called to the stand the victim of a kidnaping and rape for which Miller previously had been convicted and sentenced to life in prison. Both women testified about Miller's violent nature, specifically his aggression towards them. See *Miller*, 623 N.E.2d at 413, for a more complete recitation of their testimony.

At the post-conviction hearing, trial counsel testified that he was aware that, by offering Dr. Brogno's testimony, he was opening the door to rebuttal evidence of Miller's prior bad acts. However, trial counsel stated that he thought it was important to get the positive information about Miller before the jury.

After receiving the testimony of Dr. Brogno and the State's rebuttal witnesses, the trial court instructed the jury as follows:

> Evidence has been introduced that the defendant was involved in crimes other than those charged in the informations. This evidence has been received solely on the issue of the aggressive and sadistic tendencies or lack of such tendencies in defendant's personality. This evidence is to be considered by you only for the limited purpose for which it was received.

Trial counsel objected to the instruction on grounds that it was misleading and did not properly state Indiana law. Miller now argues that trial counsel should have objected to the instruction because it improperly emphasized Miller's prior bad acts and improperly singled out the harmful testimony of the rebuttal witnesses. Br. of Appellant at 44.

■■■■ As to the testimony itself, our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. Trial counsel testified at the post-conviction hearing that he had considered the advantages and disadvantages of having Dr. Brogno testify, and made a tactical decision to put Dr. Brogno on the stand. And our review does not lead us to a conclusion opposite that of the post-conviction court. We view the decision to put on positive character evidence and risk rebuttal with negative character evidence as another example of the kind of strategic choice which is within the province of counsel, *Parrish v. State*, 453 N.E.2d 234, 240 (Ind.1983), just as other jurisdictions have viewed the decision not to put on positive character evidence in order to avoid damaging rebuttal evidence as a strategic choice, for example, *Ohio v. Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, 956 (Ohio 1998); *Jones v. Delo*, 56 F.3d 878, 886 (8th Cir.1995).

■■■■ As to the instruction, our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. We find the instruction to be an appropriate effort by the trial court to limit the consideration by the jury of the harmful testimony of the rebuttal witnesses. Miller does not cite any cases in which a limiting instruction has been held to emphasize improperly prior crimes evidence and, as the State points out, a limiting instruction can help cure the erroneous reception of prior crimes evidence. *Heavrin v. State*, 675 N.E.2d 1075, 1083–84 (Ind.1996). Our review does not lead us to a conclusion opposite that of the post-conviction court as to the propriety of the instruction. Miller has not established that counsel's performance in this regard was deficient. We affirm the post-conviction court's conclusion that Miller has failed to demonstrate ineffective assistance of counsel in respect of these claims.

**F**

Miller lastly contends that he was denied his constitutional right to the effective assistance of counsel when trial counsel failed to advance certain mitigating circumstances during the penalty phase and at judicial sentencing. Specifically, Miller argues that trial counsel should have presented information concerning the mitigating value of (1) Miller's behavior while serving a prison sentence for kidnaping and rape; (2) Miller's social history; and (3) any residual doubt the jury might have had about Miller's participation in the crimes at issue here.

■■■■ A sentence of death may not be imposed in Indiana unless the sentencer finds that properly charged and proven aggravating circumstances specified in the death

penalty statute outweigh any mitigating circumstances with respect to the offender and the crime. Ind.Code § 35–50–2–9(e) (Supp. 1991). As such, defense counsel in a capital case has a particular duty to investigate possible mitigating circumstances and present evidence of mitigation to the jury. *Johnson v. State,* 693 N.E.2d 941, 950 (Ind.1998) (citing *Burris v. State,* 558 N.E.2d 1067, 1074 (Ind.1990)). Miller claims that trial counsel violated this duty in the three respects noted, each of which we will address in turn. However, we make the general observation that trial counsel did present substantial evidence of mitigating circumstances. While trial counsel did not make an opening statement during the penalty phase, he did present a brief closing argument in which he reminded the jury of its duty not to impose the death penalty if it did not find an intentional killing by Miller, and of its right to exercise mercy in sentencing Miller. Trial counsel also presented testimony during the penalty phase from the following individuals: (1) David Sexton, a clinical social worker; (2) Debbie Martinez, Miller's step-daughter; and (3) Harry and Mildred Miller, Miller's mother and father.[19] In addition, trial counsel incorporated by reference all testimony from the guilt phase of the trial, which included favorable testimony from Miller's wife, Betty, and Dr. Brogno.[20]

### F–1

■ The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to Miller's claim that trial counsel failed to present relevant mitigating evidence during the penalty phase about Miller's positive institutional adjustment while imprisoned. Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact.

Trial counsel retained a clinical social worker, David Sexton, to testify during the penalty phase about Miller's institutional adjustment. At trial, Sexton read from Miller's

prison records and informed the jury of the following: (1) Miller received his General Equivalency Diploma while in prison; (2) Miller served as president of the Jay–Cees; (3) Miller served as a prison trustee; and (4) Miller was written up once for having "dirty bars" on his cell.

At the post-conviction hearing, Miller presented testimony from Indiana State Prison employees Jack Duckworth, Jim Block and Bob Valentine. Duckworth, who was assistant superintendent and superintendent of the prison while Miller was incarcerated there, testified at the hearing about Miller's adaptation to the structured prison environment and Miller's ability "to remain objective and [to be] a positive influence to the other inmates." Block and Valentine testified by affidavit about their experiences working with Miller, who drove a delivery truck for the prison. Each said that Miller easily could have escaped while driving the truck, and that neither of them felt threatened by Miller. Miller also presented evidence expanding on his participation while in prison with various philanthropic and community-oriented organizations.

Although the testimony presented at the post-conviction hearing concerning Miller's positive institutional adjustment was favorable to Miller, it merely repeated and elaborated on the evidence trial counsel presented during the penalty phase at trial. Furthermore, trial counsel testified at the post-conviction hearing that he made a tactical decision not to present additional mitigating evidence regarding Miller's prison term because trial counsel did not want to overemphasize that aspect of Miller's life.

Our review does not lead us to a conclusion opposite the post-conviction court's as to counsel's performance in this regard. We view the decision to present only limited portions of Miller's history behind bars as another example of the kind of strategic choice that is within the province of counsel. *See United States ex rel. Franklin v. Gil-*

---

**19.** Miller himself also exercised his right of allocution as follows: "Well, you know, I'm sorry that this [referring to the crimes at issue] all happened, but, you know, I didn't have anything to do with it."

**20.** *See* part I–E, *supra.*

*more,* 993 F.Supp. 1162, 1180 (N.D.Ill.1998) (trial counsel not ineffective for failing to present evidence of defendant's academic achievements in prison where defendant committed several crimes, including two murders, after receiving associate's degree); *Howard v. Moore,* 131 F.3d 399, 421 (4th Cir.1997) (trial counsel not deficient for making tactical decision to present some, but not all evidence of defendant's ability to adapt to prison life), *cert. denied,* —— U.S. ——, 119 S.Ct. 108, 142 L.Ed.2d 86 (1998).

We affirm the post-conviction court's conclusion that Miller has failed to demonstrate ineffective assistance of counsel in respect of this claim.

### F–2

Miller argues that a fully developed social history would have shown the jury that Miller (1) was deeply hurt as a child by the death of his baby brother; (2) was stigmatized by another younger brother's physical handicap; and (3) was and is a sensitive and caring person. The post-conviction court made certain findings of fact from which it concluded that Miller had not carried his burden of demonstrating deficient performance or prejudice with respect to Miller's claim that trial counsel failed to present in mitigation evidence of Miller's social history.

■ Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. During the penalty phase, Miller's parents, Harry and Mildred Miller, and Miller's step-daughter, Debbie Martinez, characterized Miller as a sensitive and caring individual. Martinez also testified that she let Miller babysit her son and preferred to leave her son with Miller than with any other person. Miller himself concedes that his "life may not rise to [the] horrors of sexual abuse, abject poverty, and mental illness present in many capital cases." Br. of Appellant at 53.

Our review does not lead us to a conclusion opposite the post-conviction court's as to

counsel's performance in this regard. Trial counsel presented evidence of Miller's social history from which the jury could have made an informed decision about its weight as a mitigating circumstance. We affirm the post-conviction court's conclusion that Miller has failed to demonstrate ineffective assistance of counsel in respect of this claim.

### F–3

Miller contends that trial counsel should have emphasized to the jury that it could take into account any "residual doubt" it had about Miller's involvement in the crimes when recommending a sentence. Miller's argument here is that, in logic, a jury which finds "beyond a reasonable doubt" that a defendant committed a crime still may not be certain beyond any doubt whatsoever of the defendant's guilt, *i.e.,* that even when a jury finds a defendant guilty beyond a reasonable doubt, there still may be a measure or residuum of doubt about the defendant's guilt. Miller contends that trial counsel should have asked the jury to consider as a basis for recommending against a death sentence any remaining uncertainty or doubt that it may have had about his guilt.

■ We find such a claim too attenuated to serve as a ground for ineffective assistance of counsel. In our view, counsel ought have no obligation to argue to the jury that its just-returned unanimous determination of guilt ought be revisited. Miller cites us no authority to the contrary.[21] Of course, there will be circumstances where counsel will be required to argue the degree of a defendant's participation or the defendant's *mens rea.*[22] *See Ajabu v. State,* 693 N.E.2d 921 (1998) (remanding for resentencing). But these circumstances involve the extent of the defendant's culpability, not the existence of it. The failure to argue "residual doubt" does not constitute ineffective assistance of counsel. *See, e.g., Ohio v. Brooks,* 75 Ohio St.3d 148, 661 N.E.2d 1030, 1039 (1996) (trial counsel's decision not to argue residual doubt

---

**21.** Miller does present authority on which he relies for the proposition that counsel *may* argue residual doubt to the jury (or at least is not forbidden from doing so): *Lockhart v. McCree,* 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Johnson v. Wainwright,* 806 F.2d 1479, 1482 (11th Cir.1986); *King v. Strickland,*

748 F.2d 1462, 1464 (11th Cir.1984). None of these cases mandate that counsel present the theory to the jury.

**22.** Trial counsel did so here, in both the guilt and penalty phases. (R. at 3280; 3283; 3322; 3320; 3321; and 3386.)

in mitigation "is a tactical matter that deserves wide latitude. The merits of arguing residual doubt to a jury which has just unanimously determined that a defendant has committed the crime beyond a reasonable doubt are dubious.").

## II

Miller also contends that he was denied his constitutional right to the effective assistance of counsel when appellate counsel (1) failed to revive trial counsel's properly preserved objection to the admission of a videotaped statement made by Rodney Wood; and (2) failed to challenge (a) the trial court's deficient sentencing order, (b) the trial court's failure to admonish properly the alternate jurors, and (c) the prosecutor's elicitation of an improper comment about Miller's post-arrest silence.

■■ A petitioner claiming ineffective assistance of appellate counsel or ineffective assistance of trial counsel must show both deficient performance and resulting prejudice. The failure to establish either prong will cause the claim to fail. And where a petitioner claims, as does Miller, that appellate counsel was ineffective for failing to argue on direct appeal the ineffective assistance of trial counsel, he or she must establish both deficient performance and resulting prejudice on the part of both trial counsel and appellate counsel. *Roche*, 690 N.E.2d at 1120. The failure to establish either prong with respect to either trial or appellate counsel will cause the entire claim to fail. *Id.*

### A

Miller first argues that he was denied his constitutional right to the effective assistance of counsel when appellate counsel failed to revive trial counsel's objection to the trial court's admission of a videotaped statement made by Wood. The post-conviction court made certain findings of fact from which it

concluded that Miller had not carried his burden of proving deficient performance by appellate counsel and the requisite resulting prejudice with respect to this claim.

Wood entered into a plea agreement with the State under which he received a determinate sentence of sixty years in exchange for his testimony against Miller. On cross-examination, Miller's trial counsel questioned Wood about the existence of the plea agreement, and about certain inconsistencies between Wood's earlier statements and his testimony at trial. Three days later, the State sought to introduce into evidence a videotaped statement Wood had made to the police before he entered into the agreement with the State. The State offered the videotaped statement as a prior consistent statement to bolster Wood's credibility with the jury. At that time, trial counsel lodged the following objections: (1) the videotaped statement violated Miller's constitutional right to confront and cross-examine Wood; (2) it violated the best evidence rule; (3) it was cumulative; and (4) the resulting prejudice to Miller far outweighed any of the statement's probative value. The trial court overruled these objections and permitted the State to play the videotaped statement to the jury.[23]

■■ Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. At the post-conviction hearing, appellate counsel testified that he had considered reviving trial counsel's objection to the admission of Wood's videotaped statement, but chose not to do so because he did not think he would win.

■■ Our review does not lead us to a conclusion opposite the post-conviction court's that Miller was not denied the effective assistance of appellate counsel in respect of this claim. Counsel is not required to

---

23. The trial court also denied trial counsel's request to object to improper questions and answers during the playing of Wood's videotaped statement. The court reasoned that, because the statement was offered solely for purposes of determining credibility and not as substantive evidence, a limiting instruction to the jury would suffice. Prior to playing the tape, the trial court instructed the jury as follows:

> When the credibility of a witness has been attacked, prior statements of the witness may be admitted.
> Evidence of this kind may be considered by you only for the purpose of determining the credibility of that witness.

(R. at 2822–23; 2829.)

raise every possible claim in a direct appeal. *Brown v. State*, 698 N.E.2d 1132, 1143 (Ind. 1998); *Lowery*, 640 N.E.2d at 1049. As we said in *Lowery*, counsel should exercise professional judgment and expertise in choosing the issues raised on appeal. *Id.* at 1049. And as we recently observed in *Brown*, this comports with the United States Supreme Court pronouncement to the same effect—that effective advocacy does not mandate that the appellate attorney raise each and every non-frivolous issue. *Brown*, 698 N.E.2d at 1143 (citing *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). *See Bieghler v. State*, 690 N.E.2d 188, 194 (Ind.1997) ("the reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made"). *See also Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989) ("One of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects.").

We do make several observation on the merits of Miller's claim here as well. First, it is not clear to us why or how Wood would have been unavailable for cross-examination. As the State points out, Wood had been arrested and was in custody during Miller's trial. Miller already had had an opportunity to cross-examine Wood and makes no showing why he could not have recalled and questioned him about the videotaped statement.

In overruling trial counsel's objections to the playing of Wood's videotaped statement, the trial court relied on *Fox v. State*, 520 N.E.2d 429 (Ind.1988).[24] In *Fox*, codefendant Day testified against Fox pursuant to an agreement with the State. Following impeachment of Day by Fox's trial counsel, the State introduced Day's audio- and videotaped

statements as prior consistent statements of Day for the purpose of bolstering Day's credibility. Fox objected to admission of the taped statements on grounds that the taped statements were cumulative and served only to "underline" Day's earlier testimony. The trial court admitted a redacted version of Day's taped statements, which omitted all references to prior criminal activities in which Day had participated with Fox. Fox conceded that it was within the trial court's discretion whether to admit cumulative evidence, and provided no authority to show an abuse of discretion other than his claim that the taped statements "underlined" Day's testimony. *Fox*, 520 N.E.2d at 432. This Court found no abuse of discretion and affirmed the trial court's ruling. *Id.*

We see little to distinguish Miller's claim from that in *Fox*.[25] While Miller asserts that trial counsel "did not call into question Wood's credibility," Br. of Appellant at 75, the record demonstrates that trial counsel vigorously cross-examined Wood and inquired into the nature of Wood's agreement with the State, implying that Wood had changed his testimony because of the plea agreement.

We affirm the post-conviction court's conclusion that Miller has failed to demonstrate any ineffective assistance of counsel regarding appellate counsel's strategic decision not to revive trial counsel's objection to the admission of Wood's videotaped statement.

**B**

Miller contends that he was denied his constitutional right to the effective assistance of counsel when appellate counsel failed to challenge the trial court's sentencing order as deficient in the following respects: With regard to the sentence of death, the trial court did not (1) identify its reasons for finding aggravating circumstances (but not mitigating circumstances) to exist; (2) ade-

24. Miller's trial occurred in April, 1991, and *Fox v. State*, 520 N.E.2d 429 (Ind.1988), correctly stated the law at that time. However, the same factual situation (presented both here and in *Fox*) might be analyzed differently today, following the adoption of the Indiana Rules of Evidence in 1994, and this Court's recent decision in *Bouye v. State*, 699 N.E.2d 620 (Ind.1998).

25. We acknowledge that Wood's videotaped statement, unlike that in *Fox*, was not redacted. We conclude that Miller was not prejudiced in this regard because the content of Wood's videotaped statement was substantially similar to his testimony at trial.

quately weigh aggravating and mitigating circumstances; and (3) state its personal conclusion that death was the appropriate sentence for Miller. And with regard to the non-capital sentence of 220 years, the trial court (1) did not identify its reasons for finding aggravating circumstances to exist; and (2) summarily applied the same aggravating circumstances both to enhance sentences and to order consecutive sentences.

■■■ The post-conviction court found that (1) the trial court did not have to list every factor Miller advanced as mitigating; (2) appellate counsel's decision not to raise this issue did not constitute deficient performance; and (3) Miller suffered no prejudice from the omission. Looking first at the portion of the order sentencing Miller to death, we see that the trial court found that the State proved beyond a reasonable doubt the existence of four statutory aggravating factors supporting imposition of a sentence of death.[26] The trial court found no mitigating circumstances to exist, found further that the aggravating factors far outweighed the mitigating factors, and sentenced Miller to death. *Id.* This Court previously reviewed the trial court's sentencing order and affirmed Miller's death sentence. *See Miller*, 623 N.E.2d at 414 (DeBruler, J., concurring.) We conclude that appellate counsel did not perform deficiently in not challenging this portion of the trial court's sentencing order.

■■■■ As to the portion of the order sentencing Miller to a cumulative term of 220 years, we again find the order satisfactory.

In sentencing Miller to a cumulative sentence of 220 years, the trial court found two aggravating factors: Miller's prior criminal history and the sadistic nature of the crimes. The trial court explained why it found each aggravating factor to exist,[27] and then stated its finding that no mitigating factors existed. Relying on these aggravating factors, the court enhanced each presumptive sentence and then ordered the sentences to be served consecutively, because "the aggravating circumstances so far outweigh the mitigating circumstances." This Court previously has held that a court properly may rely on the same aggravating factors to enhance sentences and to order consecutive sentences. *Blanche v. State*, 690 N.E.2d 709, 716 (Ind. 1998); *Isaacs v. State*, 673 N.E.2d 757, 765 (Ind.1996). Appellate counsel did not perform deficiently in not challenging this portion of the trial court's sentencing order.

### C

■■■ Miller contends that he was denied his constitutional right to effective assistance of counsel when appellate counsel neglected to raise as reversible error the trial court's failure to admonish the alternate jurors not to participate in deliberations.[28] Before the jury retired to deliberate during the guilt phase of the trial, one juror, Mr. Long, experienced heart problems and was transported to the hospital. Mr. Long returned and participated in deliberations with the rest of the jury, after which the jury returned verdicts of guilty on all counts. However, before the

---

**26.** The State charged the following aggravating factors in seeking a sentence of death against Miller: (1) Miller intentionally killed the victim while committing criminal deviate conduct; (2) Miller intentionally killed the victim while committing rape; (3) Miller intentionally killed the victim while committing robbery; and (4) Miller was on parole when he committed this murder. Ind.Code § 35-50-2-9(b)(1) (Supp.1990).

**27.** In its explanation, the trial court stated the following:

[T]he Court finds as aggravating circumstances, the Defendant's prior criminal history as set out in the pre-sentence report. The Court specifically does not include the fact that Defendant was on parole. This aggravating circumstance is limited solely to the prior criminal history as shown in the pre-sentence report. The Court further finds as an addition-

al aggravating circumstance, the sadistic manner in which these crimes were committed, i.e. the evidence at trial was that the Defendant beat the victim with his fists, beat the victim with a 2x4 piece of wood and stabbed the victim with an ice pick.
(R. at 320–21.)

**28.** However, Miller's appellate counsel raised a similar argument on direct appeal, *to wit*, that it was "error for the trial court to permit alternate jurors to enter the jury room during deliberation without express consent from appellant." *Miller v. State*, 623 N.E.2d 403, 413 (Ind.1993). This Court ruled against Miller on that claim, holding that alternate jurors may sit in on deliberations so long as the trial court has properly instructed them not to participate in deliberations, and noting that Miller's trial counsel had not objected to the presence of alternate jurors during deliberations. *Id.*

penalty phase of the trial began, Mr. Long suffered a heart attack and was hospitalized. At that time, the court seated the first alternate juror in Mr. Long's stead.[29] Before sending the jury off to deliberate in the penalty phase, the trial court stated:

> Mr. Sanders, you are now a member of the jury. You are no longer an alternate. You may participate in these deliberations. Mrs. Stipp, you are still an alternate juror. I'm going to treat this the same way as with phase one [the guilt phase], and that is, you will be in the jury room during deliberations but may not participate.

(R. at 3388.)

■ This Court has held that an alternate juror may retire with the jury for deliberations so long as the trial court properly instructs the alternate juror that he or she is not to participate in the deliberative process unless and until he or she replaces a juror. *See Wilcoxen v. State,* 619 N.E.2d 574, 577 (Ind.1993); *Reichard v. State,* 510 N.E.2d 163, 167 (Ind.1987); *Johnson v. State,* 267 Ind. 256, 259–60, 369 N.E.2d 623, 625 (1977). Here, the trial court indicated that it previously had instructed the alternate jurors not to participate in the jury's deliberations. The record does not reflect that such an instruction was given in either the preliminary or final instructions to the jury during either the guilt or penalty phase, but the trial court's language supports the inference that the court earlier had instructed the alternate jurors in the manner required by law. And more importantly, trial counsel agreed to allow alternate jurors to sit in on deliberations, subject to an admonishment by the trial court. Based on these facts, we do not find appellate counsel's decision not to raise this issue to constitute deficient performance.

### D

■ Miller contends that he was denied his constitutional right to the effective assistance of counsel when appellate counsel failed to raise as reversible error an alleged violation of Miller's constitutional right against self-incrimination. During its case-in-chief, the State called to the stand the police officer who had arrested Miller. At the end of direct examination, the deputy prosecutor asked the officer if Miller had given a statement following his arrest and the reading of his *Miranda*[30] rights. The officer replied, "No ma'am. He said he didn't wish to speak to me." Miller's trial counsel did not object to this statement when it was made[31] and did not request that the court give a limiting instruction to the jury. The State did not refer back to the police officer's statement. Br. of Appellee at 20.

■ In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. 2240, 49 L.Ed.2d 91. Our cases reflect the same rule. "During trial, the State may not comment upon a defendant's post-arrest post-Miranda warning silence because that silence may be nothing more than an exercise of the Fifth Amendment right." *Wisehart v. State,* 693 N.E.2d 23, 64 (Ind.1998). Considering the limited nature of the arresting officer's comment on Miller's post-arrest silence, trial counsel's decision not to object to the statement, and the fact that the State did not refer back to the statement, we believe any error resulting from the arresting officer's

---

**29.** Trial counsel objected to the seating of the alternate juror on grounds that Miller had a right to be sentenced by the same jury that convicted him. "A defendant is entitled as a matter of right only to an impartial jury, [Ind. Const. art. I, § 8], and not to one of his precise choosing where the issue is merely replacing a regular juror with an alternate." *Jervis v. State,* 679 N.E.2d 875, 882 (Ind.1997) (citing *Whitehead v. State,* 500 N.E.2d 149, 153 (Ind.1986)).

**30.** *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**31.** Generally, the failure to object in a timely manner results in waiver of the issue. *Sanchez v. State,* 675 N.E.2d 306, 308 (Ind.1996) (instructional error); *Isaacs v. State,* 673 N.E.2d 757, 763 (Ind.1996) (prosecutorial misconduct). However, the failure to object in a timely manner does not result in waiver if the error is fundamental. *See Sanchez,* 675 N.E.2d at 309; *Isaacs,* 673 N.E.2d at 763.

comment was harmless. *See Bieghler v. State,* 481 N.E.2d 78, 92 (Ind.1985) (alleged *Doyle* violations subject to harmless error review). As such, we cannot conclude that appellate counsel's decision not to raise this issue on direct appeal constituted deficient performance.[32]

### III

 Miller concludes his petition for post-conviction relief by claiming that he has not received meaningful appellate review of his death sentence. We reject this characterization of our opinion on direct appeal. Implicit in our unanimous affirmation of Miller's sentence is our analysis and conclusion of the propriety of the sentence. In addition, an individual justice authored a separate concurring opinion in Miller's direct appeal addressing nothing but the reasonableness and propriety of Miller's death sentence. *Miller,* 623 N.E.2d at 414 (DeBruler, J., concurring).

### *Conclusion*

We affirm the denial of Perry Steven Miller's petition for post-conviction relief.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

---

**32.** In addition to the above considerations, we note also that the trial court, in its final instructions to the jury, discussed the right of a criminal defendant not to testify against himself:

Under the law of the State of Indiana, a person charged with the commission of a crime is a competent witness to testify in his or her own behalf. However, a person charged with the commission of a crime cannot be compelled to testify and is under no duty or obligation to testify.

The fact that the defendant did not testify raises no presumption of any kind against him. It shall not be commented upon, referred to, or in any manner considered by the jury in determining the guilt or innocence of the defendant.

(R. at 214.)