



FILED

Jun 03 2024, 1:17 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 21S-LW-451

## Jerry E. Russell, Sr.,

*Appellant/Defendant,*

−v−

## State of Indiana,

*Appellee/Plaintiff.*

---

Argued: October 31, 2023 | Decided: June 3, 2024

Appeal from the Greene Superior Court
No. 28D01-9810-CF-624
The Honorable Marc R. Kellams, Special Judge

---

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa and Slaughter concur.
Justice Goff dissents with separate opinion.

**Molter, Justice.**

Twenty-five years ago, a jury convicted Jerry E. Russell Sr. of murdering Pamela Foddrill and committing other heinous crimes. He was sentenced to life imprisonment without parole ("LWOP") for the murder conviction, and he received consecutive sentences of fifty years for conspiracy to commit murder, fifty years for criminal deviate conduct, and twenty years for criminal confinement. On his direct appeal, we affirmed Russell's convictions for murder and conspiracy to commit murder, and we affirmed his LWOP sentence. But we modified the judgment and sentences for the criminal confinement and criminal deviate conduct convictions with the result that Russell was sentenced to LWOP plus seventy-three years.

Russell then filed a Petition for Post-Conviction Relief ("PCR") in March 2003. A little over sixteen years later, in September 2019, he agreed with the State to dismiss his petition with prejudice in exchange for resentencing. Then, after receiving extensive evidentiary submissions and holding a resentencing hearing spanning three days, the resentencing court entered a detailed Order on Resentencing that sentenced Russell to LWOP plus seventy-three years. Russell appealed that order directly to our Court under Appellate Rule 4(A)(1), and we now affirm.

# Facts and Procedural History

## I.  Factual Background

In 1995, Pamela Foddrill lived in Linton, Indiana, with her mother, Irene. Foddrill was an intellectually disabled forty-four-year-old woman who was unmarried and had never dated. Neither Foddrill nor her mother drove, so the two would walk together to run errands. One place they visited frequently was the IGA grocery store about three blocks from their home. On a few occasions, Foddrill walked to the grocery store by herself.

During this time, Russell lived in a two-story house in Foddrill's neighborhood. The house had an upstairs bedroom and an attic storage space. Throughout 1995, Russell was acquainted with Roger Long, John Redman, and Wanda Hubbell. Redman lived nearby, and there was a locked shed near his home. Redman and his wife, Plynia Fowler, had recently divorced, but the two remained in frequent contact. Russell often saw Foddrill as she was out walking, and he once attempted to speak to her. Russell began to develop an obsession with Foddrill and spoke to Redman, Long, and Hubbell about a plan to abduct her.

On August 18, 1995, Foddrill told her mother that she wanted to go to the grocery store. Irene was not feeling well so she let Foddrill go to the store by herself. Shortly after Foddrill entered the store, she left because the store did not have what she was hoping to purchase.

As Foddrill walked home, Fowler approached and began speaking to her. Meanwhile, Russell and Redman stepped out of a station wagon and approached Foddrill from behind. The group continued to move toward a white van parked nearby. Russell and Long then grabbed Foddrill's arms and pushed her into the back of the van.

The group took Foddrill to Russell's house and confined her in the attic storage space. For a little over a week, they subjected Foddrill to multiple sexual assaults and physical torment. Russell participated in abusing Foddrill and raped her multiple times. On at least two occasions, Hubbell came over to Russell's house and also abused Foddrill. During her confinement, Russell fed Foddrill fast food and bathed her using a basin.

At some point, as Foddrill's physical condition was deteriorating, the group agreed they would kill her and dispose of her body. Around August 30, 1995, Russell and the group severely beat Foddrill with a baseball bat. Then, Russell went outside of his house to get a knife. Russell gave this knife to Redman, who used it to stab Foddrill. The group rolled Foddrill's body in a rug and put her in Redman's shed.

Sometime later, the group removed Foddrill's body from the shed and put it into a van. They drove to Lawrenceville, Illinois, and hid Foddrill's body in a wooded area. The group then returned to Linton, Indiana.

Foddrill's body was found on December 2, 1995. Long was arrested first on October 8, 1997. Redman was arrested on May 24, 1998. And after Hubbell and another individual linked Russell to the crime, Russell was arrested on October 20, 1998. While incarcerated, Russell made multiple admissions to his fellow inmates and others.

## II. Procedural History

The State charged Russell with murder, Class A felony conspiracy to commit murder, Class B felony criminal confinement, and Class A felony criminal deviate conduct. The State also sought an LWOP sentence. To support the LWOP sentencing recommendation, the State charged three statutory aggravators: (1) Russell murdered Foddrill while committing criminal deviate conduct; (2) Russell tortured Foddrill; and (3) Foddrill was a victim of criminal confinement.

Following a trial, a jury found Russell guilty of all four charged offenses. The jury also found the State proved all three statutory LWOP aggravators and recommended a sentence of LWOP. The trial court accepted the jury's recommendation and imposed a sentence of LWOP plus 120 years for the non-murder convictions.

Russell appealed his sentence to this Court, *see* Ind. Appellate Rule 4(A)(1)(a), raising five issues: (1) spousal privilege, (2) the sufficiency of the evidence for his criminal confinement conviction, (3) the sufficiency of the evidence for his deviate sexual conduct conviction, (4) a double jeopardy claim, and (5) the trial court's reliance on an improper aggravator to support his LWOP conviction. We affirmed Russell's

convictions for murder and his LWOP sentence,[1] along with his conviction for conspiracy to commit murder. *Russell v. State*, 743 N.E.2d 269, 275 (Ind. 2001). However, due to insufficient evidence of certain enhancing elements, we changed Russell's criminal confinement conviction from a Class B felony to a Class D felony and reduced the sentence to three years, served consecutively. *Id.* at 272–73. We also changed Russell's criminal deviate conduct conviction from a Class A felony to a Class B felony and imposed a sentence of twenty years, served consecutively. *Id.* at 273. Russell was sentenced to fifty years for his conviction to commit murder, so after his first appeal, his sentence stood at LWOP plus seventy-three years. *Id.* at 271, 275.

In 2003, Russell filed a PCR petition. Between May 2018 and March 2019, Russell amended this petition nine times. In September 2019, Russell and the State filed a Joint Motion to Dismiss Petition for Post-Conviction Relief With Prejudice and Modify Sentence, which reflected their agreement to dismiss the PCR petition in exchange for a resentencing hearing. They agreed the resentencing court would consider (1) whether Russell was statutorily ineligible for an LWOP sentence due to intellectual disability, (2) whether his convictions violated double jeopardy protections, and (3) applicable aggravating and mitigating circumstances. The resentencing court granted this motion on September 16, 2019. The resentencing hearing took place over three days: September 16 and 20, 2019, and February 28, 2020.

On August 16, 2021, the resentencing court entered its Order on Resentencing, which sentenced Russell to LWOP plus seventy-three years. Russell then filed a motion to correct error, which was deemed denied after the resentencing court declined to rule on it. Russell has now appealed his resentencing to this Court. App. R. 4(A)(1)(a).

---

[1] In affirming Russell's LWOP sentence, we held that the trial court's finding of the "torture" statutory aggravator was improper because this aggravator was not included in the LWOP statute at the time Russell committed the crime. *Russell v. State*, 743 N.E.2d 269, 274–75 (Ind. 2001). However, we also held this was harmless error. *Id.* at 275.

# Discussion and Decision

Russell identifies nine issues for our review, but the State contends we lack jurisdiction to consider any of them, either because appellate jurisdiction rests with the Court of Appeals rather than our Court, or, if not, then because the Superior Court lacked jurisdiction to enter its Order on Resentencing in the first place. Below, we explain why this Court has appellate jurisdiction and the Superior Court had jurisdiction to enter its order, and then we turn to Russell's appeal issues, concluding none present reversible error.

## I.  Jurisdiction

### A.  Appellate Jurisdiction

Russell appeals the Order on Resentencing directly to our Court, invoking our jurisdiction under Appellate Rule 4(A)(1)(a). That provision says, "[t]he Supreme Court shall have mandatory and exclusive jurisdiction over . . . Criminal Appeals in which a sentence of death or life imprisonment without parole is imposed." App. R. 4(A)(1)(a). But the State argues we lack jurisdiction because the appealed order, titled "Order on Resentencing," is really an order denying a request for sentence modification, and appeals from orders denying a sentence modification go directly to the Court of Appeals rather than our Court. *Wilson v. State*, 189 N.E.3d 231, 232 (Ind. Ct. App. 2022) (reviewing the denial of a sentence modification); App. R. 4 (providing the bases for Supreme Court jurisdiction).

To support its argument that the proceedings below were really for sentence modification, not resentencing, the State points out that Russell's sentences were never vacated, and the parties' joint motion triggering the proceedings was titled: "Joint Motion to Dismiss Petition for Post-Conviction Relief With Prejudice and *Modify* Sentence." App. Vol. IV at 112 (emphasis added). But other aspects of the proceedings that the State flags cut both ways.

Russell requested a Department of Correction report pursuant to Indiana Code section 35-38-1-17, which is a statute related to sentence modifications, but he stated in his request that a "resentencing hearing" had been scheduled and "[a] progress report from the DOC will be helpful to the court at the re-sentencing hearing." App. Vol. III at 157. The parties did not proceed as if they were starting from scratch, and Russell went first and last, consistent with a party shouldering the burden of proof, as would be expected in a modification proceeding. But as Russell explains, a sentencing court generally considers the case history. And the hearing was not just a standard resentencing hearing; it included what is normally a pre-trial determination of whether Russell was statutorily ineligible for LWOP, and he had the burden of proof for that issue. The State also notes the parties discussed Russell's presence as optional, which is consistent with a sentence modification rather than a resentencing because the defendant has a right to be present at sentencing. But as Russell points out, a defendant may waive their presence at sentencing, and he filed a successful Verified Motion to Waive Right to be Present for Re-sentencing.

For his part, Russell points to numerous indicia of a resentencing hearing, including the many references to a resentencing hearing in the joint motion that triggered the proceedings. The motion's introductory paragraph and prayer for relief asked the court to "conduct a new sentencing hearing" and "impose a new sentence." App. Vol. IV at 112, 113. It explained that "Indiana law permits and encourages prosecutors and post-conviction petitioners to resolve PCRs by way of an agreement that includes a change in the petitioner's sentence, or a new sentencing hearing." *Id.* at 112. It also said, "Russell does not waive his right to challenge the new sentence on appeal," and the State agreed to "a new sentencing hearing" at which the court would "impose a new sentence." *Id.* at 113. And the court's Order Granting Joint Motion said the court would "conduct a new sentencing hearing." *Id.* at 114.

Russell's submissions leading up to the hearing continued to refer to the "resentencing." For example, he filed an unopposed "Verified Motion for Leave to Present Evidence of Residual Doubt at Re-Sentencing." *Id.* at 47. He requested a continuance of the "re-sentencing hearing." *Id.* at 98.

And he submitted exhibit lists "for the re-sentencing hearing." *See, e.g.*, *id.* at 43, 45, 103, 108.

The State's own proposed order referred to the "Re-sentencing Testimony of Dr. Keyes," App. Vol. V at 87. And the court began the hearing by confirming the State's understanding that this was a resentencing:

> COURT: Alright so you have agreed to dismiss the Post-Conviction Relief Petition with prejudice and we are submitting the case to the Court for a re-sentencing is that right?
>
> MS. JOHNSON: That is correct, your honor.
>
> COURT: And the State concurs, Mr. McIntosh?
>
> STATE: Yes, your honor.

Tr. at 6. The court repeatedly referred to the proceedings as a resentencing, explaining that "the defendant's sentence is essentially being set aside and he is being re-sentenced." *Id.* at 137; *see also id.* at 243 ("This isn't a PCR, this is a sentencing hearing as though it was at the end of trial that I conducted although I didn't."). And the Order on Resentencing repeatedly refers to the proceedings as a resentencing.

Generally, the substance of a motion governs over its title. *Good v. Clinton Cir. Ct.*, 503 N.E.2d 1218, 1220 (Ind. 1987). Here, as best we can tell, the agreement the parties memorialized in their joint motion was for a resentencing proceeding rather than a sentence modification proceeding. In the joint motion, throughout the proceedings, and in the Order on Resentencing, the parties and the lower court repeatedly confirmed their understanding that the relief the parties agreed to in exchange for Russell dismissing his PCR petition was a resentencing. Understood in context, the few references to "modification" seem to refer to the possibility that the resentencing court could enter a different sentence than the original revised sentence. And the resentencing court explained that the only

reason Russell's previous sentence was not vacated was because the resentencing court was imposing the same sentence.

Because the proceedings below were for a resentencing hearing, we have jurisdiction to review the appealed order under Appellate Rule 4(A)(1).

## B. Superior Court Jurisdiction

The State next argues that while treating the proceedings as a resentencing avoids a defect in appellate jurisdiction, that treatment reveals a jurisdictional defect in the Superior Court. That is because the "trial judge generally has no authority over a defendant after sentencing." *State v. Harper*, 8 N.E.3d 694, 696 (Ind. 2014). So, the State argues, since this was not a sentence modification, and the parties dismissed the PCR petition, the Superior Court had no remaining jurisdiction to consider a new sentence.

Again, we disagree. It is undisputed that the resentencing court had jurisdiction over the PCR petition, that resentencing is a proper PCR remedy, and that the petition requested a resentencing. We have encouraged prosecutors and petitioners to agree to PCR remedies instead of litigating the underlying claims, explaining:

> We take judicial notice that Indiana prosecutors and petitioners for post-conviction relief do resolve post-conviction relief claims on terms that include a sentence different than that imposed at trial (1) prior to adjudication, and (2) after adjudication but prior to resolution on appeal. There are sound policy reasons that our system should permit prosecutors and petitioners for post-conviction relief to agree to resolve post-conviction relief claims, including facilitating resolution of meritorious, difficult-to-defend, and otherwise complex post-conviction issues; making efficient use of limited resources; and promoting judicial economy. To further these policies, we affirm the authority of prosecutors and petitioners for post-conviction relief to agree to resolve post-conviction relief claims

> on terms that include a sentence different than that imposed at trial; and we affirm the authority of post-conviction courts to accept such agreements.

*Johnston v. Dobeski*, 739 N.E.2d 121, 123 (Ind. 2000) (footnotes omitted), *overruled on other grounds in part and reaffirmed in part by State v. Hernandez*, 910 N.E.2d 213, 221 (Ind. 2009) ("We therefore reaffirm our holding in *Johnston* that the agreement between the prisoner and the county prosecutor was valid.").

That is the approach the parties took here, and their joint motion specifically cited our guidance in *Johnston* as a reason for doing so. Rather than continuing to litigate Russell's PCR claims, which had been pending for over fifteen years, the parties agreed to a narrow subset of the relief Russell sought: he could have a resentencing hearing in which the court would consider whether he was statutorily ineligible for an LWOP sentence, whether his convictions violated double jeopardy protections, and whether the applicable aggravating and mitigating circumstances warranted a different sentence.

At oral argument in our Court, the State acknowledged resentencing was an available PCR remedy, and the parties could agree to that remedy. So, if instead of saying they agreed to *dismiss* the PCR petition, the parties had said they were agreeing to *grant the petition in part* so Russell could have the hearing that occurred here, the State concedes there would be no question that the Superior Court had jurisdiction. To be sure, that would have been the better practice. But it makes no difference for purposes of jurisdiction that the parties said they agreed to "dismiss" the petition rather than "grant it in part" because, again, we evaluate the substance of their agreement rather than the labels they affixed to it. *Good*, 503 N.E.2d at 1220. And here they agreed to give Russell some of the relief he sought (granting the petition in part) through the resentencing hearing in exchange for him dismissing the remainder of his claims.

Because there is no dispute that the Superior Court had jurisdiction over the PCR petition, that the petition sought a resentencing, and that it was proper for the parties to agree to that remedy, the Superior Court's

jurisdiction was secure. Having resolved the jurisdictional questions, we turn to the merits of Russell's arguments on appeal.

## II. Russell's Arguments on Appeal

### A. Substantive Arguments

Russell's substantive arguments coalesce into four claims. First, he argues the resentencing court clearly erred by concluding he was not intellectually disabled. Second, he argues the resentencing court exceeded its discretion when finding and weighing mitigating and aggravating circumstances. Third, he argues that his convictions violate federal double jeopardy protections. And fourth, he argues his sentence was inappropriate in light of the nature of the offense and his character.

For the reasons we explain below, we reject all these arguments.

### 1. Intellectual Disability

Russell argues his LWOP sentence is improper because he is intellectually disabled, and Indiana law prohibits LWOP sentences for the intellectually disabled. Ind. Code §§ 35-36-9-6, 35-50-2-9(a).[2] In Indiana, an "individual with an intellectual disability" is any "individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of

---

[2] The dissenting opinion reasons that because the Indiana legislature provides defendants the same state law statutory protections for death penalty and LWOP sentences, any LWOP sentence must also comply with United States Supreme Court precedent applying the Eighth Amendment to death penalty sentences. *Post*, at 1–2 (Goff, J., dissenting). That conclusion doesn't follow from the premise, however. And Russell acknowledges that current United States Supreme Court precedent holds that LWOP sentences for the intellectually disabled do not violate the Eighth Amendment (although he preserves his argument that the Supreme Court should reconsider its precedent). Appellant's Br. at 34–35. To be sure, we sometimes find federal Eighth Amendment precedents analyzing death penalty sentences persuasive in the LWOP context, *see, e.g.*, *Ajabu v. State*, 693 N.E.2d 921, 937–38 (Ind. 1998), but they do not constrain our analysis.

adaptive behavior; that is documented in a court ordered evaluative report." *Id.* § 35-36-9-2 (quotations omitted). The defendant must prove both these elements by a preponderance of the evidence. *State v. McManus*, 868 N.E.2d 778, 785 (Ind. 2007). And we review a trial court's finding of whether the defendant is intellectually disabled for clear error. *Id.*

This issue is a close call because Russell introduced Dr. Dennis Keyes's expert opinion that Russell is intellectually disabled, the State concedes Russell's intellectual function is diminished, and Russell is near the line for substantial impairment of his adaptive behavior. But when the evidence presents a close call like this, our analysis turns on the standard of review. And here, we must affirm the resentencing court's finding that Russell did not satisfy his burden to prove intellectual disability because that finding is supported by evidence in the record, and it is not clearly erroneous.

The State concedes Russell proved subaverage intellectual function, but it argues the resentencing court properly concluded Russell did not prove that his adaptive behavior was substantially impaired. Adaptive behavior is evaluated by considering "how well an individual deals with everyday life demands compared to other people with similar educational and social backgrounds." *Rogers v. State*, 698 N.E.2d 1172, 1178 (Ind. 1998), *abrogated on other grounds by Pruitt v. State*, 834 N.E.2d 90 (Ind. 2005); *see also* Tr. at 24 (Dr. Keyes's testimony explaining that adaptive behavior refers to "a person's ability to mold their own behavior to the environment they are in"). To establish substantial impairment of adaptive behavior, the defendant must prove significant limitations in conceptual, social, and practical adaptive skills that manifested before the age of twenty-two. *McManus v. Neal*, 779 F.3d 634, 651 (7th Cir. 2015); *Pruitt*, 834 N.E.2d at 106–07.

Conceptual skills refer to things like "communication, functional academics[,] and self-direction." Tr. at 24. Social skills refer to "how well the person gets along with other people." *Id.* And practical skills refer to "community use, home living, health and safety[,] and self-care." *Id.* The defendant's "adaptive functioning in at least one domain must be

sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings," and "the deficits must be caused by the person's intellectual impairment." *Neal*, 779 F.3d at 650 (quotations omitted).

Russell introduced expert testimony from Dr. Keyes, a Professor of Special Education at the College of Charleston. Dr. Keyes testified about his evaluation of Russell through three adaptive behavior tests. First, Dr. Keyes testified to the Adaptive Behavior Assessment System ("ABAS-II"). Dr. Keyes used the ABAS-II to assess Russell's conceptual, social, and practical skills. Russell gave himself high scores for these skills, putting him well above the maximum threshold for intellectual disability. But Dr. Keyes also asked two of Russell's siblings to score Russell. And they provided much lower scores that would put Russell in the range for "low functioning adaptive skills." Tr. at 27.

Dr. Keyes testified that the scores from Russell's siblings were more reliable than Russell's self-evaluation. But the resentencing court disagreed, giving the siblings' scores little weight because Russell had not demonstrated their evaluations were reliable, and the siblings "may be inclined to portray Mr. Russell as less competent than he actually is in an effort to avoid Mr. Russell being sentenced to life without parole." App. Vol. V at 133–34.

Second, Dr. Keyes evaluated Russell using the Independent Living Scale ("ILS"). The ILS measures memory/orientation, managing money, managing home and transportation, health and safety, and social adjustment. A composite score of fifty to seventy on the ILS is required to find intellectual disability. On this test, Russell's scores ranged between sixty-two to ninety-six, with a composite score of seventy-five. The resentencing court gave greater weight to the ILS because the court believed the standardized test was "more objective and reliable than the third-party observations provided by Mr. Russell's siblings." *Id.* at 134.

Third, Dr. Keyes testified to Russell's results on the Wide-Range Achievement Test ("WRAT"). This test measures spelling, math, and reading comprehension. Again, Russell's scores were above the threshold

for intellectual disability, and Dr. Keyes described Russell as performing "reasonably well" on the test. Tr. at 32.

Dr. Keyes thought the ILS and WRAT scores overstated Russell's abilities because they reflected the more rigid structure that his prison environment provided, which was more conducive to developing the abilities that the ILS and WRAT assess. But the resentencing court found that "[t]hese primary academic skills are closely related to the ability to function in daily living activities," and it considered these scores "important indicators of [Russell's] adaptive behaviors." App. Vol. V at 134.

Finally, the resentencing court engaged in a more open-ended evaluation of Russell's work history and day-to-day life. It found that Russell's "history indicates his abilities rather than his deficits." *Id.* The court considered the facts that Russell was married before he was incarcerated, "was employed, worked on his home, and paid his monthly bills." *Id.* Russell "also had a driver's license, owned vehicles and had them registered. Furthermore, [Russell] helped care for his two children while also helping his disabled brother and his blind mother with errands and household chores." *Id.*

Russell contests these facts, arguing he had help with some of these tasks and that many are not as sophisticated as they appear. He also argues that many of the activities the State highlighted, and the resentencing court considered, are not demonstrative of Russell's true capacity for adaptive behavior. For example, Russell points out that while the resentencing court noted Russell worked on his home, the State concedes Russell's home was in "poor condition." Appellee's Br. at 51. Also, though the resentencing court found that Russell completed his GED while incarcerated, he had to take the GED test multiple times before passing.

But to determine whether findings of fact are clearly erroneous, we do not reweigh the evidence or determine the credibility of witnesses. *Womack v. Womack*, 622 N.E.2d 481, 484 (Ind. 1993). Instead, we consider only whether the evidence supports reasonable inferences reflected in the trial court's findings. *Id.* "Only where the record contains no facts or

inferences supporting the trial court's findings are the findings clearly erroneous." *Id.* And if the record contains evidence that supports conflicting inferences, the inferences the trial court drew will prevail. *Id.*

Though Russell presents colorable rebuttals to the resentencing court's factual determinations, the evidence still supports the court's finding that he is not intellectually disabled. The resentencing court was permitted to give more weight to the two adaptive behavior tests reflecting a lack of adaptive impairment (ILS and WRAT) and to discount the third test's (ABAS-II) reliance on Russell's siblings based on their incentive to shade their reporting to Russell's benefit. Our Court took the same approach in *McManus* when we reversed the trial court's intellectual disability finding, explaining that the results of a behavioral assessment were "open to doubt" because the family members who supplied the responses "might be inclined to portray Mr. McManus as less competent than he might actually be, in an effort to help him evade the death penalty." *McManus*, 868 N.E.2d at 789 (quotations omitted); *see also id.* ("It seems apparent that these scores, inconsistent with the rest of the record, were suppressed by the affection of the relatives who supplied the input.").

The resentencing court's analysis of other evidence, like Russell's living experience and work history, also tracked our Court's analysis in *McManus* and *Rogers*. *McManus*, 868 N.E.2d at 789 ("An adequate adaptive behavior assessment necessarily considers McManus' work history and day-to-day life, both of which illustrate his abilities—not deficits."); *Rogers*, 698 N.E.2d at 1180 (affirming the trial court's finding that the defendant failed to demonstrate substantially impaired adaptive behavior because he "was living in the community," "operating an automobile," was living with a partner, "bringing money home," and was "able to go where he wanted to go" (quotations omitted)).

While we must defer to the resentencing court's factual findings, we do not defer to its legal analysis, and Russell correctly points out that the resentencing court's order includes a misstatement about the legal standard for the adaptive behavior prong. After discussing evidence of Russell's adaptive behavior and otherwise conducting the analysis properly, the court said: "Additionally, Dr. Keyes testified that regardless

of Jerry Russell's low IQ, nothing prohibits him from knowing the difference between right and wrong; *an acceptable standard for determining adaptive behavior*." App. Vol. V at 134 (emphasis added); *see also id.* at 138 (stating that "[a]ny intellectual disability [Russell] may have does not overcome the fact that he knew that what he was doing was wrong").

This language conflates the adaptive behavior analysis with the affirmative defense of mental disease or defect. I.C. § 35-41-3-6. A defendant's ability to distinguish between right and wrong is relevant to the mental defect defense but not to the standard for determining adaptive behavior. Had the court based its conclusion about Russell's adaptive behavior on this standard, its finding may have been clearly erroneous.

But the resentencing court's misstatement was not the basis for its adaptive behavior conclusion. Immediately after detailing Russell's day-to-day adaptive behavior, and immediately *before* its reference to the wrong standard, the court said: "*These factors* show that [Russell] possesses the adaptive behaviors necessary to handle everyday life, despite his test scores." App. Vol. V at 134 (emphasis added). This reflects that the court's conclusion—that Russell's adaptive behavior was not substantially impaired—was based on the proper standard and its proper weighing of the evidence.

In sum, the resentencing court's finding that Russell failed to demonstrate intellectual disability was not clearly erroneous. The weight the court assigned to the conflicting evidence was properly within its discretion, and we will not reevaluate the persuasive weight the court gave to Russell's and the State's arguments. And while the resentencing court did refer to the wrong standard when discussing Russell's adaptive behavior, it ultimately applied the correct standard.

## 2. Mitigating and Aggravating Circumstances

### a. Failure to find mitigators

Next, Russell argues the resentencing court exceeded its discretion by rejecting several of his proposed mitigating sentencing factors.

We review a sentencing court's decision about whether to find a mitigating factor for an abuse of discretion. *Carter v. State*, 711 N.E.2d 835, 838–39 (Ind. 1999). "An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record." *Id.* at 838. Sentencing courts are "under no duty to deem mitigating every factor" advanced "simply because it [was] supported by some evidence in the record." *Bivins v. State*, 642 N.E.2d 928, 952 (Ind. 1994). And "the sentencing judge is not obligated to explain why [they have] chosen not to make a finding of mitigation . . . . Moreover, the [sentencing] court is not obligated to credit or weigh the defendant's evidence of mitigating circumstances the same way the defendant does." *Id.* (quotations omitted).

Russell claims that the resentencing court declined to adopt three mitigating factors that the record clearly supports. We address each below.

### i. Intellectual Disability

Intellectual disability can be a mitigating factor at sentencing. *See Young v. State*, 696 N.E.2d 386, 391–92 (Ind. 1998) (holding that the trial court should have considered the defendant's diminished mental capacity as a mitigating factor after the trial court concluded the defendant's intellectual disability precluded an LWOP sentence). Russell recycles his earlier argument that he is ineligible for an LWOP sentence because he is intellectually disabled to support his alternative conclusion that the resentencing court "abused its discretion by failing to find that Russell's intellectual disability was a mitigator." Appellant's Br. at 67. The resentencing court acknowledged Russell suffers from significantly

subaverage intellectual functioning but found that evidence of his adaptive behavior to be "debatable." App. Vol. V at 136. The court therefore assigned "minimal weight" to Russell's intellectual limitations. *Id.*

Deference to a sentencing court's decision on whether to find a mitigator is greatest when the evidence supporting that mitigator is disputable. *Hammons v. State*, 493 N.E.2d 1250, 1254 (Ind. 1986). Because Russell's intellectual disability is debatable, the resentencing court did not exceed its discretion by assigning minimal weight to that consideration.

## ii. Residual Doubt

"Residual doubt" refers to the notion that "even when a jury finds a defendant guilty beyond a reasonable doubt, there still may be a measure or residuum of doubt about the defendant's guilt." *Miller v. State*, 702 N.E.2d 1053, 1069 (Ind. 1998). Russell argues the resentencing court exceeded its discretion by concluding "[t]here was insufficient residual doubt to modify the Defendant's original sentence." App. Vol. V at 140. The State disputes that residual doubt is a legitimate sentencing mitigator, and it argues that even if residual doubt is a legitimate mitigator, the resentencing court did not err by rejecting it here.

To support his argument that residual doubt "is a non-statutory mitigator for LWOP and the death penalty," Appellant's Br. at 69, Russell cites three cases—two from our Court and one from the United States Supreme Court: *Overstreet v. State*, 783 N.E.2d 1140 (Ind. 2003), *Dumas v. State*, 803 N.E.2d 1113 (Ind. 2004), and *Lockhart v. McCree*, 476 U.S. 162 (1986).

As for our Court's prior decisions, *Overstreet*'s residual doubt discussion was limited to clarifying that capital defendants do *not* have a constitutional right to a residual doubt jury instruction and acknowledging that the sentencing court gave little weight to the defendant's residual doubt argument. 783 N.E.2d at 1163, 1167. In *Dumas*, the defendant failed to make a residual doubt argument, and our Court simply held that the trial court did not abuse its discretion when it

declined to find residual doubt as a mitigator. 803 N.E.2d at 1123–24. Our Court has never decided one way or the other whether residual doubt is a proper mitigator.

As for the United States Supreme Court, its *Lockhart* residual doubt discussion was in the context of explaining that one of Arkansas's claimed interests in using unitary juries for capital cases (*i.e.*, using the same jury to decide guilt and sentencing) was that "the defendant might benefit at the sentencing phase of the trial from the jury's 'residual doubts' about the evidence presented at the guilt phase." 476 U.S. at 181. That Court's subsequent opinions explicitly disclaim ever holding that defendants "have an Eighth Amendment right to present 'residual doubt' evidence at sentencing." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 250–51 (2007).[3] And many members of that Court have expressed either their view that there is no constitutional right to argue residual doubt as a mitigating factor, or their skepticism that there is such a right,[4] although some justices have

---

[3] *See also Oregon v. Guzek*, 546 U.S. 517, 525 (2006) (explaining that "this Court's previous cases had *not* interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast 'residual doubt' on his guilt of the basic crime of conviction." (emphasis in original)).

[4] *Guzek*, 546 U.S. at 528 (Scalia & Thomas, JJ., concurring in the judgment) ("In this case, we have the opportunity to put to rest, once and for all, the mistaken notion that the Eighth Amendment requires that a convicted capital defendant be given the opportunity, at his sentencing hearing, to present evidence and argument concerning residual doubts about his guilt. Although the Court correctly holds that there is no Eighth Amendment violation in this case, I would follow the Court's logic to its natural conclusion and reject all Eighth Amendment residual-doubt claims."); *Franklin v. Lynaugh*, 487 U.S. 164, 174–75 (1988) (plurality of Rehnquist, C.J., and White, Scalia, and Kennedy, JJ.) ("This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor . . . . In sum, even if petitioner had some constitutional right to seek jury consideration of 'residual doubts' about his guilt during his sentencing hearing—a questionable proposition—the rejection of petitioner's proffered jury instructions did not impair this 'right.'"); *id.* at 187 (O'Connor & Blackmun, JJ., concurring in the judgment) ("Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt.").

disagreed.[5] Courts around the country are divided on whether residual doubt is a proper mitigator, and, if it is, what limits are placed on its consideration. *See, e.g.*, *Com. v. Fisher*, 813 A.2d 761, 776–77 (Pa. 2002) (Saylor, J., concurring) (collecting authority).

We decline to resolve those questions here because, regardless of the answers, the resentencing court did not exceed its discretion. It permitted Russell to argue residual doubt at the hearing, and he did so by attacking the credibility of key witnesses who testified against him at trial as well as the plausibility of their claims; pointing to a lack of physical evidence linking him to Foddrill's murder; and cataloging his activities during Foddrill's confinement that he argued were inconsistent with what would be expected of someone housing a kidnap victim. Russell's counsel argued that "when all of the relevant evidence is considered it is hard to avoid the conclusion that [Russell] was wrongfully convicted." Tr. at 85.

The resentencing court reviewed Russell's trial transcript, the trial transcripts for all three co-defendants, and the previous sentencing court's findings. After reviewing all those materials, and the remaining materials submitted in the resentencing proceedings, the resentencing court did not find the testimony Russell offered in support of his residual doubt argument credible. And it was unwilling to second-guess the jury's evaluation of claimed evidentiary gaps and inconsistencies in witnesses' testimony. The court also considered the fact that Russell "made incriminating statements to several individuals, some of whom were not

---

[5] *Burr v. Florida*, 474 U.S. 879, 882 (1985) (Marshall & Brennan, JJ., dissenting) ("I have written before to describe the subjective personal horror that must face a juror who contemplates sentencing a man to die without being sure of his guilt. But there is an additional point to be made: that permitting the consideration of lingering doubt at sentencing is objectively a rational and consistent element of our system of criminal justice. Like postconviction remedies in light of new evidence, the conscience of the jury serves to protect against irremediable errors arising in that gray area known as 'reasonable doubt.' And when the stakes are life and death, the Constitution forbids the closure of that safety valve, as surely as it forbids the preclusion of other considerations suggesting that a convicted defendant should not die." (citation omitted)).

inmates, including his wife, Sara Russell, his friend, Jerry Mae Saude, and his first wife, Patricia Criss." App. Vol. V at 138.

We generally defer to those sorts of credibility determinations and evidentiary weighing. *Loehrlein v. State*, 158 N.E.3d 768, 774 (Ind. 2020) (explaining that "we must rely on our trial court to assess the weight of the evidence and credibility of the witnesses"). But Russell argues we should not give that deference here because the resentencing judge was not the judge who oversaw the trial, so he did not observe the testimony in person. We disagree because, as the resentencing judge explained, that makes it even more reasonable to defer to the conclusions of the jury and the first sentencing judge when deciding whether the evidence at trial supported a mitigator.

To that point, Russell responds that deferring to the jury and a prior sentencing judge defeats the purpose of a residual doubt mitigator, which presupposes a conviction based on a finding of guilt beyond a reasonable doubt. Even more so here, Russell says, because his residual doubt argument depends heavily on evidence he did not introduce and arguments he did not make at his trial. But Russell does not cite any cases holding that a sentencing judge who did not oversee the trial producing a conviction exceeds their discretion by deferring to the conclusions of the jury and prior sentencing judge rather than crediting new evidence and arguments, including inadmissible evidence like polygraph results.

Nor do we see any basis for such a conclusion. It is one thing to say a judge who harbors doubt about guilt may factor that into a sentence. It is quite another to say the judge must credit evidence—even inadmissible evidence—that has never been tested at trial to reach the conclusion that the jury may have made a mistake. That is more like a collateral attack on the conviction in the guise of a sentencing argument, and we conclude the resentencing court did not exceed its discretion by rejecting it. Put another way, we are only reviewing whether the resentencing court exercised its discretion reasonably, and it is not unreasonable to credit a jury's conviction that was based on proof beyond a reasonable doubt and to discredit new evidence and arguments.

### iii. Lesser Participation

The LWOP statute lists mitigating circumstances that are to be considered before imposing the death penalty or LWOP. I.C. § 35-50-2-9(c). It is a mitigating circumstance if "[t]he defendant acted under the substantial domination of another person." *Id*. § -9(c)(5). And an individual's lesser participation in a criminal offense can also be a mitigating factor at sentencing. *See, e.g.*, *Brown v. State*, 720 N.E.2d 1157, 1160 (Ind. 1999) (explaining that "in light of his youth and role as a follower . . . we conclude that his sentences for murder and conspiracy should be served concurrently rather than consecutively").

But these mitigators do not apply simply because others have even greater culpability for the crime than the defendant. For example, in *Sensback v. State*, the defendant and her fiancé went to the house of the defendant's seventy-one-year-old step-great-aunt. 720 N.E.2d 1160, 1162 (Ind. 1999). There, the defendant's fiancé pepper sprayed the aunt, dragged her through the kitchen, and threw her down the basement steps. *Id.* The defendant did not deliver the killing blow to the victim (a strike with a hammer), but "chose the victim . . . , conceived of the plan to rob her, provided the car to get to the house, gained entry by pretending to come for a visit, was present in the house . . . , acted as [a] look-out . . . , and completed the robbery" while the victim was being killed. *Id.* at 1164. We found that "[i]n light of the magnitude of [the defendant's] other involvement, the fact that she did not actually wield the hammer [was] not enough to be considered a significant mitigating factor." *Id.*

Here, Russell argues the resentencing court exceeded its discretion when it declined to find mitigating that Russell "acted under the substantial domination of Redman and Long, and he was a lesser participant." Appellant's Br. at 97–98. He points to the State's concession at trial that Russell did not deliver the killing blow to Foddrill. But the State counters that "the record demonstrates that Russell was a major participant in the planning, abduction, rape, and murder of [Foddrill]." Appellee's Br. at 94.

Russell does not point to any evidence of his substantial domination by Redman and Long or of his lesser participation in Foddrill's murder.

Instead, he merely generalizes that "[l]ike most intellectually disabled individuals, he is a follower," "is easily influenced and talked into things," and is "unusually vulnerable to negative influences." Appellant's Br. at 98. He also relies on an affidavit from his sister in which she reported Russell was afraid of Redman and Long. *Id.* at 99.

But as the State points out, the record contains substantial evidence that Russell had a leading role in the crime. His claims of love for Foddrill led to the plot to abduct her; he helped abduct Foddrill by grabbing her and forcing her into a van; he sexually assaulted Foddrill multiple times; he retrieved the knife which he knew would be the murder weapon; and he helped dispose of Foddrill's body in Illinois.

Russell's participation is closely analogous to the defendant's in *Sensback*. Though he did not deliver the killing blow, Russell was intricately involved in every stage of the criminal conduct. The resentencing court thus did not exceed its discretion when it refused to find substantial domination or lesser participation as mitigating factors.

In sum, Russell has failed to demonstrate that the record clearly supports intellectual disability, residual doubt, or substantial domination/lesser participation. The resentencing court acted within its discretion when it declined to find these factors as mitigating to Russell's sentence.

## b. Aggravating Factors

Russell also contends the resentencing court exceeded its discretion by relying on aggravators the record does not support and assigning undue weight to aggravators regarding his non-murder convictions. Because the offenses occurred before 2005, the resentencing court was required to "properly weigh[ ]" aggravators and mitigators, *Jackson v. State*, 728 N.E.2d 147, 155 (Ind. 2000), but "the appropriateness of the sentence as a whole is entitled to great deference and will be set aside only on a showing of a manifest abuse of discretion," *White v. State*, 847 N.E.2d 1043, 1045 (Ind. Ct. App. 2006).

Russell claims the resentencing court relied on two aggravators that the record does not support. First, Russell points out a typographical error in the resentencing order regarding his prior conviction for child molesting.[6] The resentencing order lists Russell's conviction as a Class B felony, but it was a Class C felony. Regardless of whether the felony was a Class B or Class C level, the resentencing court appropriately considered it as a "significant conviction" when reviewing Russell's criminal history. App. Vol. V at 135.

Second, Russell claims the resentencing court "found that [he] sexually violated Foddrill's body after she was killed" as an additional aggravator. Appellant's Br. at 114. Though Russell persuasively argues this fact was not supported by the record, he fails to show that the resentencing court considered it as an aggravator. The only three aggravators the resentencing court considered were Russell's criminal history, Foddrill's mental status, and Russell's probationary status. The finding that Russell violated Foddrill's body was not made by the resentencing court and only appeared in the court's order when it recited the findings of Russell's original sentencing court.

For the aggravators the resentencing court *did* consider, Russell claims the resentencing court exceeded its discretion by assigning undue weight to Russell's criminal history and Foddrill's mental infirmity. Regarding his criminal history, Russell essentially argues that his offenses are not serious enough to be given significant weight, and that "the aggravating nature of [his] conviction[s] is offset to some extent by [his] intellectual disability." *Id.* at 116. But the resentencing court declined to reduce the aggravating weight of Russell's criminal history, and it acted within its discretion to do so. As discussed above, the court did not clearly err when it found that Russell was not intellectually disabled. And while Russell contests the gravity of his offenses, *see Wooley v. State*, 716 N.E.2d 919, 929 n.4 (Ind.

---

[6] We are confident this was a mere typographical error in the resentencing order because the same sentence that contains the error also lists the cause number of Russell's conviction as Class C: "The Defendant was also convicted in 1993 for Child Molesting as a class B felony in cause number 28C01-9008-CF-0043; a significant conviction." App. Vol. V at 135.

1999) (explaining that trial courts must consider the gravity, nature, and number of prior offenses as they relate to the current offense), the resentencing court was not required to accept these arguments and was instead free to assign considerable aggravating weight to the convictions, *see White*, 847 N.E.2d at 1045 (explaining that the weight a trial court assigns to mitigating and aggravating factors is entitled to great deference).

A similar analysis applies to the resentencing court's decision to assign aggravating weight to Foddrill's mental limitations. Russell claims that the court exceeded its discretion when it "refused to recognize that [he] is also mentally infirm, to a similar degree as Foddrill." Appellant's Br. at 119. But again, the court properly found that Russell was not intellectually disabled. Thus, it was under no obligation to reduce the aggravating weight it gave to Foddrill's mental limitations. Moreover, this aggravator is an inquiry into the *victim's* mental condition. Even if the court did find Russell to be mentally infirm, the weight of this aggravator would not necessarily change.

### c. Aggravating Factors and *Blakely*

Russell argues the resentencing court considered improper aggravators when it imposed sentences above the statutory presumptions for his non-murder convictions.

A sentencing court must follow the sentencing scheme in place when the offense occurred. *Robertson v. State*, 871 N.E.2d 280, 286 (Ind. 2007). When Foddrill was murdered in 1995, the sentencing scheme required judges to sentence convicted defendants to terms of imprisonment within a statutory range established for each felony. *See Anglemyer v. State*, 868 N.E.2d 482, 485–86 (Ind. 2007), *clarified on reh'g on other grounds*. The sentencing scheme also provided a presumptive sentence for each offense. *Id.* at 485. Absent aggravating or mitigating circumstances, judges were required to impose the presumptive sentence. *Id.* at 485–86. Judges were generally free to find any relevant aggravators and impose above-

presumptive sentences without a jury finding additional facts beyond a reasonable doubt.[7] *Id.* at 486.

But in 2004, the United States Supreme Court decided *Blakely v. Washington*, which held that the Sixth Amendment right to a jury trial required that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 542 U.S. 296, 301 (2004) (quotations omitted). So following *Blakely*, a judge could increase a sentence based on only: (1) facts that a jury found beyond a reasonable doubt; (2) the defendant's prior convictions and general criminal history, including their probationary status when committing the offense if that status is reflected in a presentence investigation report that a probation officer prepared; (3) facts the defendant admitted; and (4) facts the sentencing judge found after the defendant, in the course of a guilty plea, waived *Apprendi* rights and consented to judicial fact-finding or the stipulation of certain facts. *Robertson*, 871 N.E.2d at 286.

Since Indiana's then-effective sentencing scheme required judges to impose the presumptive sentence for offenses in the absence of any aggravators or mitigators, the statutory presumptive sentence was the "maximum sentence" for *Blakely* purposes. *Anglemyer*, 868 N.E.2d at 486 (quotations omitted). In 2005, we recognized that Indiana's sentencing scheme was not compatible with *Blakely*. *Smylie v. State*, 823 N.E.2d 679, 685 (Ind. 2005). And we held that all facts used to increase a defendant's sentence above the statutory presumptive level had to fall within one of the four categories listed above. *Id.* at 685–86.

---

[7] Specifically, the sentencing scheme required judges to consider five enumerated factors, but it permitted judges to also consider other aggravators and mitigators and provide its balancing conclusions. *Totten v. State*, 486 N.E.2d 519, 523 (Ind. 1985). Following this open-ended inquiry, the judge could sentence the defendant to a term of imprisonment below, at, or above the statutory presumptive term. *Anglemyer v. State*, 868 N.E.2d 482, 486 (Ind. 2007), *clarified on reh'g on other grounds*.

Sentencing courts must comply with *Blakely* in all cases, even when the offense was committed before *Blakely* was decided. *Id.* at 690–91. Thus, if a "pre-*Blakely* conviction" is being resentenced in a "post-*Blakely* world," the sentencing judge must not exceed the *Blakely* maximum sentence. *Kline v. State*, 875 N.E.2d 435, 438 (Ind. 2007). Russell's resentencing occurred in a "post-*Blakely* world," so the court recognized that it was required to abide by this framework. App. Vol. V at 134.

Russell was convicted of three non-murder offenses: conspiracy to commit murder, a Class A felony; criminal confinement, a Class D felony; and criminal deviate conduct, a Class B felony. In 1995, the presumptive sentence was thirty years imprisonment for Class A felonies, I.C. § 35-50-2-4 (1995), ten years for Class B felonies, *id.* § -5 (1995), and one and one-half years for Class D felonies, *id.* § -7(a) (1995). Along with LWOP for murder, the resentencing court sentenced Russell to fifty years for conspiracy to commit murder (twenty years above the presumptive sentence), twenty years for criminal deviate conduct (ten years above the presumptive sentence), and three years for criminal confinement (one and one-half years above the presumptive sentence). In total, Russell was sentenced to thirty-one and one-half years above the statutory presumptive sentences for his non-murder offenses. Thus, the resentencing court was required to find aggravators that fell within one of the four categories listed above.

This, Russell claims, is where the resentencing court erred. According to Russell, the resentencing court relied on nine aggravators to support its above-presumptive sentence determination: (1) Russell's criminal history, (2) Foddrill's mental limitations, (3) Russell's probation status at the time of the offense, (4) the fact that Russell was a major participant in the offense, (5) Russell's participation in planning the offense, (6) the brutality of the offense, (7) Foddrill's confinement in Russell's home, (8) Russell's involvement in and presence during the entire sequence of criminal activity, and (9) Russell's participation in hiding Foddrill's body and sexually violating Foddrill's body after she had been killed. Since "[n]one of these factors were submitted to the jury, found beyond a reasonable doubt by the jury, or admitted by" him, Russell argues the sentencing order violated *Blakely*'s requirements. Appellant's Br. at 112.

But the resentencing court's order reveals there is no *Blakely* violation. First, it is clear that the resentencing court relied on only three aggravators: criminal history, Foddrill's mental limitations, and Russell's probationary status. The other "aggravators" Russell lists are not mentioned under the "Aggravating Circumstances" heading. App. Vol. V at 135–36.

Instead, they are included under the next heading—"Mitigating Circumstances"—in the context of discussing Russell's proposed residual doubt mitigator, and the resentencing court merely mentioned that they were the findings of the original sentencing court. *Id.* at 136–40. There is nothing to suggest that the resentencing court relied on these findings from the 1999 sentencing hearing as aggravating factors for the 2021 resentencing order.

Second, the three aggravators the resentencing court *did* rely on (aggravators (1)–(3) above) all fit comfortably within categories that *Blakely* permits courts to consider when increasing a sentence. Criminal history is one category, *Robertson*, 871 N.E.2d at 286, so it was proper for the resentencing court to consider Russell's prior convictions and to conclude his "criminal history [was] an aggravating circumstance." App. Vol. V at 135.

It was also proper for the resentencing court to consider Foddrill's mental limitations as an aggravator because Russell has repeatedly admitted to them. The clearest admission of Foddrill's mental condition occurred when Russell's 2019 proposed sentencing order referred to Foddrill as "mentally infirm." App. Vol. IV at 233.

Finally, it was proper for the resentencing court to consider Russell's probationary status at the time of the offense as an aggravator. Like Foddrill's mental status, Russell's proposed sentencing order admitted that his probationary status was a proper aggravator. And the presentencing investigation report, which was prepared by a probation officer, indicated Russell was on probation at the time of Foddrill's murder.

Because it imposed greater-than-presumptive sentences for each of these convictions, the court was required to find aggravating circumstances that fell within one of the categories that *Blakely* permits courts to consider when increasing a sentence. All three of the court's aggravators did, so there is no *Blakely* violation.

### 3. Double Jeopardy

Russell next claims that, if his LWOP sentence is affirmed, he "is entitled to have his sentence for criminal deviate conduct vacated to avoid a violation of [his] double jeopardy rights under the Fifth and Fourteenth Amendments to the United States Constitution." Appellant's Br. at 100. We review double jeopardy claims de novo. *Wadle v. State*, 151 N.E.3d 227, 237 (Ind. 2020).

The Fifth Amendment's Double Jeopardy Clause provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. That includes that a person may not receive "multiple punishments for the same offense." *Laux v. State*, 821 N.E.2d 816, 819 (Ind. 2005) (quotations omitted). Russell argues that because a statutory aggravator supporting his LWOP sentence relies on the finding that he murdered Foddrill while committing criminal deviate conduct, he cannot also be separately convicted of the criminal deviate conduct *offense*. I.C. § 35-42-4-2 (1995). He points out that in his co-defendant Long's appeal, the State agreed to vacate the sentence for criminal deviate conduct on this same basis. *Long v. State*, 743 N.E.2d 253, 259 (Ind. 2001).

We agree with the State that this argument is foreclosed by our subsequent decision in *Laux*. There, we held that a separate sentence for an offense that was also used as an aggravator to support the defendant's LWOP or death penalty sentence does not violate the double jeopardy clause. *Laux*, 821 N.E.2d at 820–21.

The aggravating circumstances necessary to support the death penalty or LWOP are not the same as elements of a crime. *Id.* at 820. "Because the felonies listed in [the LWOP statute] are not elements of the crime, but

rather a list of permissible aggravators, they essentially serve a function analogous to sentencing enhancements. The statute thus indicates only what felonies are permissible to consider in imposing life without parole." *Id.* As we explained in *Laux*, this is consistent with the United States Supreme Court's view. *See Witte v. United States*, 515 U.S. 389, 399 (1995) ("[U]se of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause.").

### 4. Appropriateness of Sentence

Russell further argues that his sentence is inappropriate in light of the nature of the offense and his character.

The Indiana Constitution authorizes appellate review and revision of a trial court's sentencing decision. *See* Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020). "That authority is implemented through Appellate Rule 7(B), which permits an appellate court to revise a sentence if, after due consideration of the trial court's decision, the sentence is found to be inappropriate in light of the nature of the offense and the character of the offender." *Faith v. State*, 131 N.E.3d 158, 159 (Ind. 2019).

Our role is to "leaven the outliers," which means we exercise our authority only in "exceptional cases." *Id.* at 160 (quotations omitted). Thus, we generally defer to the trial court's decision, and our goal is to determine whether the defendant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

The nature of Russell's offenses is horrific. He forcibly abducted Foddrill as she was walking home from the grocery store. Then, he and his companions confined Foddrill to the attic in Russell's residence. Russell raped Foddrill multiple times. Russell participated in the beating that preceded Foddrill's murder. When the group finally decided to kill Foddrill, Russell retrieved the knife they used as the murder weapon. Finally, after Foddrill had been brutally stabbed to death, Russell helped hide her body in another state. The abhorrent nature of Russell's crimes does not suggest any restraint, regard, or lack of brutality.

As to his character, Russell argues that any intellectual impairment he may suffer from lowers his criminal culpability and that his good behavior while incarcerated and religious activity speak to his good character. He further contends that factors such as his disadvantaged background and his expression of sorrow should serve as further mitigating factors.

But the resentencing court exercised reasonable discretion when it assigned little weight to these points. *See Houser v. State* 823 N.E.2d 693, 700 (Ind. 2005) (upholding LWOP sentence in spite of defendant's abusive upbringing). Russell's criminal history provides a much more convincing view of his character. Russell was convicted of felony child molesting and had his parental rights terminated in 1993. He often beat his first wife. He was convicted of felony unauthorized use of a vehicle and misdemeanor conversion. He has multiple juvenile adjudications. And as discussed above, the resentencing court found that Russell was not intellectually disabled.

In seeking a reduced sentence under Rule 7(B), Russell has the burden to show "substantial virtuous traits or persistent examples of good character." *Stephenson*, 29 N.E.3d at 122. Russell has failed to present compelling evidence to portray the nature of his offense in a positive light and to evince his good character.

## B. Procedural Arguments

Russell's procedural arguments coalesce around three claims. He argues the resentencing court (1) failed to afford him due process, (2)

exceeded its discretion by excluding his non-stipulated polygraph, and (3) failed to supply adequate findings to support the LWOP sentence. Again, we conclude none of these issues present any reversible error.

## 1. Due Process

Russell argues the State deprived him of due process by failing to provide a fair procedure to determine if he was intellectually disabled.

Before an individual is deprived of any liberty interest, they are entitled to due process of law. U.S. Const. amend. XIV, § 1. Generally, due process requires fair notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotations omitted)). "Due process is a flexible concept which calls for such procedural protections as the time, place, and circumstances demand." *Mitchell v. State*, 659 N.E.2d 112, 114 (Ind. 1995). Whether a given procedure satisfies the requirements of due process is a question of law. *Holmes v. Randolph*, 610 N.E.2d 839, 844 (Ind. 1993). We review questions of law de novo. *State v. Moss-Dwyer*, 686 N.E.2d 109, 110 (Ind. 1997).

Russell claims the resentencing court's hearing to determine whether he is intellectually disabled was procedurally unfair in three ways: (1) the court did not follow appropriate clinical standards; (2) the court ignored both historical and record evidence that showed Russell is intellectually disabled; and (3) when issuing its order, the court's findings of fact merely adopted the State's proposed findings. But Russell's due process argument fails for two related reasons.

First, Russell's argument is not a due process argument at all; it is a critique of the resentencing court's analysis, which is a complaint about substance rather than procedure. The Indiana Code provides a statutory procedure for determining intellectual disability, and Russell neither argues the statute violates due process, nor that the resentencing court failed to follow the statutory procedure. I.C. §§ 35-36-9-1 to -7. Instead,

Russell's due process argument just repackages his substantive arguments, which fail for the reasons we explain throughout this opinion.

Second, Russell never made a due process argument below, so he forfeited it. *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018) ("A party's failure to object to an alleged error at trial results in waiver, also known as 'procedural default' or 'forfeiture.'"). He argues that the reason he did not object to any resentencing procedure (or lack of procedure) is that the due process violations were not apparent until he reviewed the resentencing court's final order. But that just illustrates the previous point—his objection really is to the substance of the court's analysis, not the procedure it used to give Russell notice and an opportunity to be heard.

We also reject Russell's argument that his resentencing hearing was unfair because the court's findings regarding his alleged intellectual disability closely mirrored the State's proposed findings. Lower courts are faced with an enormous volume of cases and limited resources, and an effective justice system requires efficiency, so "we do not prohibit the practice of adopting a party's proposed findings." *Prowell v. State*, 741 N.E.2d 704, 709 (Ind. 2001). But we also acknowledge that, when a court's findings are identical to those proposed by the prevailing party, "there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Id.*

We have no such concerns with the resentencing court's findings in this case. The court's order restructures portions of the State's proposed findings regarding intellectual disability and adds its own observation about Russell's GED. *See Stevens v. State*, 770 N.E.2d 739, 762 (Ind. 2002) (determining that a court's additions and alterations to proposed findings showed that "the court carefully considered and purposefully used . . . the individual findings proposed by the State"). Other portions of the court's order differ from the State's proposed order substantially. For example, the court added a mitigating factor of childhood neglect that was entirely absent from the State's proposed order. The fact that the court's findings on the single issue of intellectual disability closely mirror the State's proposed findings does not suggest the court failed to perform a sufficient

analysis. Instead, it merely suggests that the court was more persuaded by the State on that issue.

In short, Russell's due process argument is about substance rather than process. Even if it were a procedural argument, it would be forfeited. And the portions of the resentencing order that are adopted from the State's proposed findings do not undermine our confidence in the court's analysis.

## 2. The Exclusion of Russell's Non-Stipulated Polygraph Report

Russell argues the resentencing court exceeded its discretion when it excluded the results of a non-stipulated polygraph test.

On July 13, 2019, over two decades after Foddrill was murdered, Russell passed a non-stipulated polygraph test in which he was asked: "(1) Did you actively participate in the death of Pamela Foddrill? (2) Did you see Pamela Foddrill take her last breath? (3) Do you know for sure where Pamela Foddrill died? [And] (4) [d]id you see Pamela Foddrill get into that white van at the IGA parking lot?" Ex. Vol. XI at 30. The record does not reflect Russell's responses, but the polygraph examiner concluded Russell's responses did not indicate deception, and Russell argues the most reasonable inference from that conclusion is that Russell responded "no" to each question.

At resentencing, Russell's counsel moved to admit the polygraph result into evidence to support his residual doubt argument. The State objected, acknowledging that the Rules of Evidence did not apply, but arguing the State was not consulted before the test was administered, and the test was far too removed from the events surrounding Foddrill's murder to be reliable. The resentencing court sustained the State's objection but did not say why. The court's order also does not discuss the excluded polygraph test.

"The admission or exclusion of evidence rests within the sound discretion of the trial court, and we review for an abuse of discretion." *Conley*, 972 N.E.2d at 871. A trial court exceeds its discretion "only where

the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001).

In Indiana, polygraph results are generally inadmissible in criminal trials "[b]ecause of their inherent unreliability combined with their likelihood of unduly influencing a jury's decision." *Smith v. State*, 547 N.E.2d 817, 820 (Ind. 1989). They are only admissible in criminal trials if both sides stipulate to their admissibility. *Sanchez v. State*, 675 N.E.2d 306, 308 (Ind. 1996). But the Rules of Evidence do not apply to sentencing proceedings. *See* Ind. Evidence Rule 101(d)(2) (providing that the Indiana Rules of Evidence do not apply to sentencing proceedings except that the rules for evidentiary privileges do apply). "The rationale for exempting certain proceedings, including sentencing, from the rules of evidence is to provide the trial judge with the widest range of relevant information in reaching an informed decision." *Dumas*, 803 N.E.2d at 1121.

Even if there are circumstances where non-stipulated polygraph results are admissible at sentencing hearings, it does not follow that a trial court exceeds its discretion whenever it sustains an objection to their admission. Here, the State argued, among other things, that the polygraph was too remote in time to be reliable. Russell did not offer any argument in response. The resentencing court did not exceed its discretion by accepting the State's unrebutted argument.

The case law Russell cites supports this conclusion. He relies on a case from the Georgia Supreme Court—*Height v. State*, 604 S.E.2d 796 (Ga. 2004)—for the proposition that courts have held "that a convicted person's polygraph report is admissible at a capital sentencing hearing to show residual doubt." Appellant's Br. at 64. But the Georgia Supreme Court went on to explain:

> We caution, however, that today's holding should not be misconstrued as authorizing the admission of polygraph test results in the penalty phase of every capital case. While the scope of permissible mitigation evidence is wide, it is not so extensive as to allow the wholesale admission of all evidence contended to be mitigating without respect to its reliability.

> *When the defendant seeks to introduce unstipulated polygraph test results as mitigation evidence, the trial court must exercise its discretion to determine whether those results are sufficiently reliable to be admitted.*

*Height*, 604 S.E.2d at 798–99 (emphasis added) (cleaned up).

Moreover, even if the resentencing court had exceeded its discretion by excluding the polygraph results, the error would be harmless. App. R. 66(A) ("No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties."). Under Appellate Rule 66(A)'s "probable impact test," Russell "bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (quotations omitted). He cannot do so on this record. The resentencing court permitted Russell to present what he describes as a "wealth of exculpatory evidence" supporting his residual doubt theory, Appellant's Br. at 73, and he does not provide any reason to believe that this single additional piece of evidence—an unstipulated polygraph taken decades after the murder with no foundation of reliability—would have moved the needle.

Because Russell did not establish the reliability of the polygraph results, the resentencing court did not exceed its discretion by sustaining the State's objection. And even if the resentencing court had been mistaken in excluding the polygraph results, the error would be harmless.

### 3. Inadequate Findings to Support LWOP Sentence

Russell argues the resentencing court's order was insufficient because it did not include findings that are required for LWOP sentences. We agree, but we conclude, based on our own independent reweighing of the statutory aggravators and relevant mitigators, that Russell's LWOP sentence is appropriate.

### a. *Harrison* Requirements

"A sentence of life without parole requires findings that (1) the State proved at least one [statutorily-required] aggravating circumstance beyond a reasonable doubt and (2) the aggravating circumstances outweigh any mitigating circumstances." *Pittman v. State*, 885 N.E.2d 1246, 1252 (Ind. 2008). For jury trials before 2002, the jury made those findings and recommended whether to impose an LWOP sentence, but the judge was not bound by the findings or required to follow the recommendation. *Id.* The judge had to independently assess and weigh the aggravating and mitigating circumstances, and then make the final determination whether to impose an LWOP sentence. *Id.* The judge could only impose an LWOP sentence through a detailed order that had to:

> (i) . . . identify each mitigating and aggravating circumstance found, (ii) . . . include the specific facts and reasons which [led] the court to find the existence of each such circumstance, (iii) . . . articulate that the mitigating and aggravating circumstances [had] been evaluated and balanced in determination of the sentence, and (iv) . . . set forth the trial court's personal conclusion that the sentence [was an] appropriate punishment for [the] offender and [the] crime.

*Harrison v. State*, 644 N.E.2d 1243, 1262 (Ind. 1995) (citations omitted).

In 2002, the General Assembly amended the death penalty and LWOP statute. Pub. L. No. 117–2002, § 2, 2002 Ind. Acts 1730, 1734. This amendment requires that, when there is a jury trial, the jury must decide "whether the charged aggravating circumstance or circumstances have been proved beyond a reasonable doubt, whether any mitigating circumstances that exist are outweighed by the aggravating circumstance(s), and whether to impose a sentence of . . . life imprisonment without parole." *Helsley v. State*, 809 N.E.2d 292, 300 (Ind. 2004). If the jury recommends the death penalty or LWOP under this amended framework, the sentencing judge generally must comply with

the jury's recommendation. I.C. § 35-50-2-9(e); *see also Pittman*, 885 N.E.2d at 1253.

Thus, for capital and LWOP cases after the 2002 amendment, if a jury finds at least one statutory aggravator proven beyond a reasonable doubt and recommends the death penalty or LWOP, we do not require as much detail in the sentencing judge's order. *Pittman*, 885 N.E.2d at 1254 ("When a jury makes the final sentencing determination, a *Harrison*-style order would be out of place."). But even after the 2002 amendment, if the judge is not bound by a jury recommendation and instead "exercises discretion over the sentence imposed," then the sentencing order must still comply with *Harrison*'s requirements. *Id.* (explaining that when "the role of the trial judge is similar to the judge's role under the pre-2002 statute," the "sentencing order must comply with *Harrison*").

Here, the jury was instructed that its sentencing recommendation was not binding on the trial court, and Russell's resentencing did not involve a jury. So the parties agree that the resentencing court had to comply with *Harrison* before imposing an LWOP sentence. Russell argues the resentencing order is insufficient because it does not contain all the *Harrison* findings, and the State does not disagree (other than to argue that this was a sentence modification order rather than a resentencing order, but we rejected that argument above). In particular, Russell notes the order does not find that the State proved at least one of the charged statutory aggravators beyond a reasonable doubt, and it does not differentiate between any of the other non-statutory aggravators it found and the statutory aggravators required to impose an LWOP sentence.

When we confront a sentencing order that fails to satisfy *Harrison*'s requirements, we have three options: (1) remand the case to the sentencing court for either a clarification or new sentencing decision; (2) affirm the LWOP sentence if the sentencing order's error was harmless beyond a reasonable doubt; or (3) independently reweigh statutory aggravators and applicable mitigating circumstances through our appellate review. *Bivins*, 642 N.E.2d at 957. Both Russell and the State propose that the third option is appropriate here, which is the same approach we took for Russell's direct appeal.

We again choose that option, and after independently reweighing the statutory aggravators and applicable mitigating circumstances, we conclude Russell's LWOP sentence is appropriate.

## b. Independent Reweighing

The State charged Russell with two aggravators relevant here: (1) Russell murdered Foddrill while committing or attempting to commit criminal deviate conduct or rape, I.C. § 35-50-2-9(b)(1)(D), (F) (1995); and (2) Foddrill was murdered while a victim of criminal confinement or rape, *id.* § -9(b)(13)(C), (D) (1995).[8] The jury found Russell guilty of both criminal deviate conduct, *id.* § 35-42-4-2 (1995), and criminal confinement, *id.* § 35-42-3-3 (1995), and we previously held that the State proved those charges beyond a reasonable doubt. *Russell*, 743 N.E.2d at 275 ("We also find beyond a reasonable doubt that Russell committed criminal deviate conduct upon Foddrill, and that she was a victim of criminal confinement and rape."). Those convictions are the basis for the non-LWOP portion of Russell's sentence, and nothing in Russell's submissions has persuaded us to reconsider our previous holding. Thus, the State proved two statutory aggravators beyond a reasonable doubt.

We must balance those two statutory aggravators against any mitigators we find relevant to Russell's LWOP sentence. Like the resentencing court, we find Russell's intellectual functioning (but not adaptive behavior) mitigating. Additionally, Russell suffered neglect as a child and has exhibited good behavior while incarcerated. As we said in Russell's direct appeal, "[w]e are cognizant of and sympathetic to Russell's mental limitations, his history of family neglect, his Bible study and desire to minister to others, his expression of sorrow, and the needs of his mother and brother." *Id.*

---

[8] The State also charged, and the jury agreed, that Foddrill was tortured. But we set aside that aggravator on Russell's direct appeal because the LWOP statute did not list torture as an aggravator when the crime was committed. *Russell*, 743 N.E.2d at 274–75.

Yet even after considering the additional evidence presented at resentencing, the result of our independent reweighing of the statutory aggravators and mitigators remains unchanged from Russell's direct appeal. As we said before, "these factors do not supply sufficient explanation for Russell's conduct or otherwise offset the gravity of the aggravating circumstances." *Id.* The mitigating circumstances in this case are substantially outweighed by the aggravating circumstances, and it is therefore our independent conclusion that Russell's LWOP sentence is appropriate.

# Conclusion

For these reasons, we affirm the resentencing court's order.

Rush, C.J., and Massa and Slaughter, JJ., concur.
Goff, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT
Lisa Malmer Johnson
Law Office of Lisa Malmer Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Megan M. Smith
Sierra A. Murray
Office of the Attorney General
Indianapolis, Indiana

**Goff, J., dissenting.**

I agree with much of the Court's opinion but differ on one crucial point. The trial court did not, in my view, apply a medically informed standard when assessing Jerry Russell's claim of intellectual disability.

# The trial court did not apply a medically informed standard for adaptive deficits.

By statute, a murder defendant "with an intellectual disability" is ineligible for a sentence of life without the possibility of parole (LWOP). Ind. Code § 35-50-2-9(a). Such a defendant must prove by a preponderance of the evidence that he "manifests," before age twenty-two, "significantly subaverage intellectual functioning" and "substantial impairment of adaptive behavior." I.C. § 35-36-9-2; *Pruitt v. State*, 834 N.E.2d 90, 103 (Ind. 2005) (imposing the preponderance standard).[1] Here, the parties dispute only whether Russell proved the adaptive-behavior element.

I first lay out the medically informed standard I believe courts should use for identifying adaptive deficits. I then explain how the trial court failed to apply such a standard.

## A. Our standard for intellectual disability should reflect current medical knowledge.

Defining the standard for "substantial impairment of adaptive behavior" calls for an examination of federal Eighth Amendment law. That's because, as the State concedes, a "defendant facing an LWOP sentence is entitled to the same procedural and substantive rights" as in a death-penalty case. Appellee's Br. at 72; *see also Wright v. State*, 168 N.E.3d

---

[1] While the language of the statute could suggest a focus on a defendant's abilities before age twenty-two, it has been understood simply as specifying the required time of onset. *See Pruitt v. Neal*, 788 F.3d 248, 266 (7th Cir. 2015).

244, 261 (Ind. 2021). This is not a constitutional mandate but a legislative one: "by inserting life without parole into the death penalty statute the legislature chose to impose life without parole as an alternative punishment applicable only to death penalty eligible convictions." *Ajabu v. State*, 693 N.E.2d 921, 938 (Ind. 1998) (applying U.S. Supreme Court precedent to limit the scope of an LWOP aggravator). The United States Supreme Court's jurisprudence in this area thus carries more than merely "persuasive" authority in Indiana LWOP cases. *See ante*, at 11 n.2.

There is, of course, an Eighth Amendment bar on executing "*any* intellectually disabled individual." *Moore v. Texas*, 137 S.Ct. 1039, 1048 (2017) (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)). Under U.S. Supreme Court precedent, a state's determination of intellectual disability "must be 'informed by the medical community's diagnostic framework.'" *Id.* (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014)). Our own case-law reflects this principle. *See State v. McManus*, 868 N.E.2d 778, 785, 787–88 (Ind. 2007) (referring to standards published by two professional medical organizations).[2] While states need not adhere to "everything stated in the latest medical guide," they may not disregard "current medical standards," such as those appearing in "leading diagnostic manuals" like the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*. *Moore*, 137 S.Ct. at 1048–49. Even if reference to Eighth Amendment standards were not mandatory, expert medical understanding of intellectual disability would still be vitally important for judges tasked with making these determinations. Hence why the legislature requires an "evaluation" before any decision is made. I.C. § 35-36-9-3(c).

Relevant here, the adaptive-functioning criterion for intellectual disability in the *DSM-5* requires deficits that "result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility." Am. Psychiatric Ass'n, *Diagnostic and Statistical*

---

[2] The two organizations were the American Association on Mental Retardation, now known as the American Association on Intellectual and Developmental Disabilities, and the American Psychiatric Association. *McManus*, 868 N.E.2d at 785.

*Manual of Mental Disorders* 33 (5th ed. 2013). The *DSM-5* looks at "adaptive reasoning in three domains: conceptual, social, and practical." *Id.* at 37.[3] A person's deficits satisfy the adaptive-functioning criterion "when at least one domain" is "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38. The American Association on Intellectual and Developmental Disabilities (AAIDD)'s definition is "substantively similar." Daniel Flack, et al., *Following Up After* Moore *and* Hall*: A National Survey of State Legislation Defining Intellectual Disability*, 28 Psychol. Pub. Pol'y & L. 459, 460 (2022).

The U.S. Supreme Court has pointed out several traps to beware of when determining a defendant's adaptive functioning, two of which are especially relevant here. First, courts should not overemphasize a defendant's "adaptive strengths" because "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Moore*, 137 S.Ct. at 1050 (citations omitted). Indeed, the AAIDD states that assessors must "assume that limitations often coexist with strengths." AAIDD, *Defining Criteria for Intellectual Disability*, https://perma.cc/3492-KAA7 (last visited June 3, 2024). Finally, courts should be careful about relying "on adaptive strengths developed in a controlled setting," like a prison. *Moore*, 137 S.Ct. at 1050 (internal quotation marks and citation omitted); *see also DSM-5*, *supra*, at 38.

In sum, a medically informed adaptive-behavior inquiry asks whether the defendant has intellectual deficits that necessitate ongoing support in daily life activities outside prison—**not** primarily whether the defendant has strengths in some areas or whether the defendant functions adequately inside prison.

---

[3] The conceptual or academic domain involves competence in areas like memory, language, math, and problem-solving. *DSM-5*, *supra*, at 37. The social domain involves aspects like "awareness of others' thoughts, feelings, and experiences" and "interpersonal communication skills." *Id.* The practical domain involves "learning and self-management across life settings, including personal care, job responsibilities, money management," and more. *Id.*

## B. The trial court relied on evidence of Russell's adaptive strengths while disregarding evidence of his deficits.

There is conflicting evidence as to whether Russell has substantial adaptive deficits, including much that speaks to how he managed life as an adult before going to prison. However, rather than weighing this extensive evidence, the trial court's resentencing order relies largely on facts that do not negate intellectual disability, such as Russell having married, been employed, worked on his home, and paid bills. And, in its analysis of Russell's test scores, the trial court failed to weigh the impact of his years in the highly structured prison environment.

I summarize just a sample of the evidence in the record as follows.

The evidence shows unequivocally that Russell had substantial impairments as a child. According to one of his brothers, Russell wore diapers until just before he started first grade at age seven. When Russell was fourteen, an educational psychologist assessed him (using the language of the time) to be "in the middle of the educable mentally retarded range." Ex. Vol. IV, p. 10. Russell would probably be "unable to master adequately all the tools of learning," the report went on, but could "succeed if schoolwork is geared to his needs and abilities." *Id.* Normal classroom activities would be "confusing" to Russell, so placement in a special-education class was warranted. *Id.* And he needed particular instruction on "[p]ersonal hygiene." *Id.* Another assessment at age fourteen found that Russell had the vocabulary of an eight-year old and struggled with "social expectancies" and "commonsense judgment." *Id.* at 35.

The evidence of how Russell functioned as an adult before going to prison is conflicting. His former wife once stated, in the context of a social-security disability determination, that Russell couldn't "buy groceries when instructed," "estimate how much food to get," or use money. Ex. Vol. X, p. 58. On good days, he could do chores like washing dishes and putting away leftovers if shown how, she said. On bad days, he couldn't "follow simple directions." *Id.* at 59. Russell's wife didn't trust him to

babysit children or use the stove. It was, she summed up, "like having a child to care for." *Id.* at 58.

The reliability of Russell's wife's statements is somewhat questionable because other evidence suggests Russell was not quite so impaired. A psychologist who examined Russell for social-security purposes reported that his "actual functional level" belied his IQ score. *Id.* at 67. Russell told him that he met "all of his basic personal needs independently" and would drive himself to stores and select goods. *Id.* at 67–68. The psychologist deemed Russell "capable of managing disability funds." *Id.* at 68 (emphasis omitted). A letter from an elderly neighbor at the time of Russell's original sentencing attested that he would take fifty dollars, buy her groceries, and come back with the receipt.

This is only an illustration of the many conflicts in the evidence from Russell's life before prison. The parties' appellate briefs dispute at length the evidence concerning Russell's employment, money-management skills, childcare abilities, home repairs, and more. To give just two more examples, Russell told a psychologist in 1990 that he had lost "five or six jobs" because, being unable to read, he would always "do something [he] shouldn't do." *Id.* at 64. And, while Russell had worked on repairing his house, local officials deemed it uninhabitable and disconnected the utilities.

The evidence of Russell's functioning as an adult in prison is also mixed. For example, one performance report stated that he completed all his tasks as a kitchen worker and taught others how to improve. Many other reports say Russell works well and stays out of trouble. He has earned certificates for work done with nail-guns, saws, drill presses, and other hand-tools, and gotten qualified to operate forklifts. On the other hand, Russell's work in the kitchen was limited to washing dishes. When he tried to help with cooking, he couldn't calculate "how much of each ingredient to use to prepare food for a certain number of people." Ex. Vol. XI, p. 26.

For purposes of this litigation, Dr. Dennis Keyes, a professor of special education, assessed Russell, interviewed his siblings and a parole or probation officer, and reviewed records. He testified that Russell is

intellectually disabled, likely since he was less than five years old, and has "severe impairments" to his awareness, understanding, logic, memory, appreciation of cause and effect, and ability to plan. Tr. Vol. II, pp. 40–41. Dr. Keyes asked a brother and sister of Russell's about his functioning by using the Adaptive Behavior Assessment System II (ABAS II) test. Their answers placed Russell clearly within the range of disability. Russell's own answers placed him clear of that range. Dr. Keyes also assessed Russell against the Independent Living Scales (ILS) and scored him at 75, which is right at the "cut-off" but nevertheless "within the range" of disability, after allowing for the standard measurement error of five points. *Id.* at 25, 31–32. Dr. Keyes did not break down the ILS scores but Russell appears to have scored especially low on memory/orientation, managing money, and health and safety. On the Wide-Range Achievement Test (WRAT), Russell scored 76 on reading comprehension and 76 on math. However, Dr. Keyes explained that Russell achieved these scores only after years of highly structured prison life, which improved his ability to function.

Our review is for clear error. *Pruitt*, 834 N.E.2d at 104. But, as I explained above, a trial court's inquiry should focus on the magnitude of the defendant's deficits, not just his strengths, and recognize the limited evidentiary value of how well he functions in the structured prison environment.

Here, the trial court's resentencing order relies in significant part on evidence about Russell's pre-prison adult life. But it focuses almost entirely on what the trial court saw as his adaptive strengths, rather than evidence regarding his asserted deficits. Indeed, the adaptive-behavior section of the order mentions **none** of the evidence of Russell's real-life weaknesses either in childhood or adulthood. Instead, it relies on Russell having gotten married, been employed, worked on his home, paid bills, held a driver's license, owned vehicles, and helped with errands, chores, and caring for family members.

The trouble with this analysis is that people with mild intellectual disability can carry out tasks of daily life like shopping, child-care, and banking with "some support," and can hold "jobs that do not emphasize

conceptual skills." *DSM-5*, *supra*, at 34. Dr. Keyes explained that intellectually disabled people can often perform "monotonous jobs" correctly. Tr. Vol. II, p. 30. And he expressly stated that while Russell is capable of getting a job and taking "care of himself in most things," somebody "will have to keep an eye on him." *Id.* at 42. In another Indiana case, an expert explained that "individuals with mild intellectual disability are able to find employment in a variety of fields and are able to obtain a driver's license." *Pruitt v. Neal*, 788 F.3d 248, 259 (7th Cir. 2015). Courts can no longer rely on the "incorrect stereotypes" that intellectually disabled people "cannot have jobs or relationships." *Smith v. Sharp*, 935 F.3d 1064, 1086 (10th Cir. 2019).

Turning to Russell's test scores, the trial court found most convincing his ILS and WRAT scores, rather than the ABAS II scores based on his siblings' responses. The composite ILS and WRAT scores were at or just above the cut-off for intellectual disability after allowing for the standard error. Critically, though, the trial court disregarded Dr. Keyes's warning that Russell achieved scores this high only because he was living in a prison providing "about the highest structure you are going to find." Tr. Vol. II, p. 26.

In sum, the trial court rejected uncontradicted expert testimony that Russell is intellectually disabled by citing evidence of Russell's abilities that are—when viewed in a medically informed way—**consistent** with him being disabled. The trial court did not engage with the evidence tending to show Russell's deficits and ignored the impact of prison structure on his test scores. The trial court was not bound to credit or accept evidence favoring Russell's claim, of course, but it was bound to consider it. The order under review would not pass muster in a death-penalty case. *See, e.g., Jackson v. Kelley*, 898 F.3d 859, 865 (8th Cir. 2018) (criticizing the district court for determining that the applicant's "adaptive strengths," some of which he had developed in prison, "outweighed his adaptive deficits"). Nor should it pass muster here.

Because I consider the trial court's findings inadequate to deem Russell eligible for LWOP, I would vacate the sentence and remand for further findings. I respectfully dissent.